974 A.2d 951

**Lamont WHALEY**

**v.**

**STATE of Maryland.**

**No. 1383, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 2, 2009.

432

Renee M. Hutchins (Nancy Forster, Public Defender, on the brief), Baltimore, for appellant.

Daniel J. Jawor (Douglas G. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: DAVIS, ZARNOCH and MATRICCIANI, JJ.

ZARNOCH, J.

On July 9, 2007, appellant Lamont Whaley was tried by a jury in the Circuit Court for Wicomico County for his alleged involvement in the attempted armed robbery of Higimio Mendez–Roque. At the time of the alleged incident, Whaley was 16 years and four months old. Prior to trial, due to Whaley's age, defense counsel sought to have Whaley's case removed from circuit court to juvenile court and to have Mendez–Roque's pretrial identification of Whaley and his co-defendant suppressed. Both motions were denied. At trial, Whaley was convicted of attempted armed robbery, attempted robbery, first degree assault, reckless endangerment, and conspiracy. He was found not guilty of carrying a dangerous concealed weapon and wearing and carrying a dangerous weapon with intent to injure.

Appellant presents the following issues in his appeal:

1. Did the judge abuse her discretion during the reverse waiver hearing by considering non-statutorily enumerated factors as a primary basis for denying Lamont's transfer of jurisdiction, when the defense counsel, through Juvenile Services Reverse Waiver Report, met its burden of showing

that Lamont would be fit for rehabilitation in the juvenile system?

2. Must Lamont's conviction be reversed because the record clearly reflects that the court allowed impermissible and inflammatory prosecutorial remarks during summation, which amounted to reversible error and a denial of the constitutional right to a fair trial?

3. Must Lamont's conviction be reversed and a claim for ineffective assistance of counsel stand because of defense counsel's failure to object to the prosecutor's change of theory after the jury began deliberations?

For the following reasons, we reverse the judgment of the circuit court and remand for proceedings consistent with this opinion.

## FACTS AND LEGAL PROCEEDINGS

On January 12, 2007, shortly after 7:10 p.m., Salisbury police responded to a call reporting an attempted armed robbery at 609 Railroad Avenue. According to the victim, Mr. Mendez–Roque, two black males approached him outside his residence at 609 Railroad Avenue. They asked him if he had any money and proceeded to search his pockets. After discovering nothing in his pockets, one of the pair attempted to grab Mendez–Roque's knapsack from his shoulder. At the same time, the other pulled out a BB gun and shot Mendez–Roque twice in the face. Whether the first would-be robber also had a BB gun and fired would be a matter of some dispute.

Shortly after the attempted robbery, Alex Venandez, a friend of Mendez–Roque, called the police. Venandez did not witness the attempted robbery, but communicated with the police, since Mendez–Roque spoke little or no English. Mendez–Roque was unable to provide a clear description of the would-be robbers. He did not see their faces "because they had it [hoods] closed, the jacket closed up." Mendez–Roque did not specify any of their features, such as height, weight, or facial appearance. However, through Venandez, Mendez–Roque did describe the assailants as two black males with black

hoods and gray shirts. According to Salisbury Police Officer Jason Harrington, Mendez–Roque told him that only one of the two males had a BB gun.[1] Gustavo Gomez, who lived in a house adjacent to Mendez–Roque and who had scared away the attempted robbers when he came outside of his home, told the officer that both men had BB guns.

After receiving the description, Harrington left the scene to assist Officer Underwood of the Salisbury Police Department, who had detained a group of five teenagers who matched the limited description given by Mendez–Roque. At 210 Records Street, a second group of three teenagers was detained by Officer Jeff Hughes. Appellant Lamont Whaley was one of the teenagers stopped by Hughes. According to Hughes, Whaley and another teenager, Christopher Maine, were wearing gray jackets and dark colored hoods. Whaley was the taller of the two. The third person detained was wearing an orange colored jacket. At trial, Hughes stated that Whaley did not have a hood on when he was stopped, and that neither Whaley nor Maine had a hood on with fur around it.[2] Hughes performed a pat down and found on Maine what appeared to be CO–2 cartridges in his pocket. Whaley, Maine, and the third youth were detained so that Mendez–Roque could identify them.[3]

Mendez–Roque and Venandez were transported in Officer Dimare's patrol car to the show-up. Dimare relied on Venandez to communicate between him and Mendez–Roque. At trial, Mendez–Roque testified through an interpreter that when he arrived at 210 Records Street, "there were other young men, and there were police officers and they didn't take me in right next to them or in front of them but they pointed them to me." Mendez–Roque stated at trial that he identified Whaley and Maine based on the clothing they were wearing.

---

1. Officer Harrington testified about the single BB gun at both the May 2, 2007 suppression hearing and the July 9, 2007 trial.

2. At trial, Mendez–Roque testified that both assailants had fur around the hoods of their sweatshirts or jackets.

3. The third teenager was later released.

At trial, Dimare said that Mendez–Roque pointed in the area where the officers had detained Whaley and Maine, but that he did not know what Venandez said to Mendez–Roque before he pointed in Whaley's direction.

At trial, Mendez–Roque testified that during the attempted robbery, his view of the two men was limited because during the entire incident, he was looking straight ahead and focusing on getting to the front door of his residence. Shortly before the attempted robbery, Mendez–Roque had stopped by a laundromat. There, he saw the two would-be assailants, without their hoods. For this reason, he was able to identify the two suspects, even though their identities were obscured by their "furry hoods" at the time of the attack. Mendez–Roque left the laundromat and went to his former residence on Cherry Street. There, he drank a beer and gathered his belongings. He did not see the pair from the laundromat again until he arrived at Railroad Avenue. Mendez–Roque also testified that the two males did not follow him and that, prior to the laundromat, he had never seen either of them.

After the show-up, Whaley and Maine were charged.[4] Whaley filed a Petition For Waiver of Jurisdiction to the Juvenile Court and Request For a Study Concerning Child. The State filed an opposition to the request for a reverse waiver, asserting among other things, that the "[d]efendant is alleged to have pulled a BB gun on the victim in an attempted armed robbery and then shot the victim in the head several times," and that the court had to presume the guilt of Whaley for purposes of the reverse waiver proceeding.[5]

On May 1, 2007, a reverse waiver and motions hearing was held for both defendants. Darlene White, a Case Manage-

---

4. A Statement of Probable Cause was prepared at the same time as the Statement of Charges and alleged that both suspects were armed and began shooting at the victim. Mendez–Roque was "shot numerous times in the head, face, and hand area. [He] was shot one time in forehead between his eyes, four times on the left side of his head, and two times on his right hand by BB projectiles ..."

5. The request for a study was granted.

ment Specialist with the Department of Juvenile Services (DJS), presented a Waiver Report to the court on Whaley. In it, she recommended that "the Court consider waiver of jurisdiction back to the juvenile system since Lamont [Whaley] has not been afforded various services that are available to youth that are processed through the Court system."[6] White was quizzed by the court on the ability of DJS to place Whaley in a secure facility if he were adjudicated by the juvenile court of an attempted robbery or first degree assault:

> THE COURT: ... Assume, for the sake of argument, that these facts were established, whether it was determined to be a robbery or an assault, I mean if these are the facts that support the underlying finding, there is no plan in place at this point in time for you to say this would be, if these facts were adjudicated our plan would be X and therefore we could address the issue of public safety. That's not something you're prepared to testify to today, is that correct?

> WHITE: Not at this moment since I don't know what the adjudicated offense would be at this point.

> \* \* \* \* \* \*

> PROSECUTOR: Assuming that he's adjudicated delinquent of an attempted armed robbery, what options are there for him in Juvenile Services?

---

**6.** At the May 1 hearing, White described the report in the following fashion:

> Basically I looked in the aspects that we're concerned with when we do a reverse waiver and that's just the five aspects of the age, mental/physical condition, amenability to treatment, nature of the offense and public safety ...

She also testified that, despite appellant's prior "contacts" with the juvenile system and school altercations,

> Lamont has never been adjudicated, therefore, he has not had the opportunity for any kind of probation or any kind of placement with our department[,] so we feel that, after meeting with the resource department, that he should have an opportunity to do the services that are available to youth who have been adjudicated through the juvenile system.

WHITE: There are secure confinement facilities that would be available to him. Sometimes they are difficult to get into but they are available.

THE COURT: Of course, and if you can't get into them—

PROSECUTOR: Then what do you do with them?

THE COURT: Good question.

All right, anything else?

The DJS report also stated:

Few offenses pose more serious risk to the safety of our public than the use of a weapon in the commission of crime. While the nature of the offense is serious[,] it is noted that the weapon used was a BB gun. Young people who become involved in these types of offenses can be held accountable in juvenile jurisdiction. Public safety can be ensured in juvenile jurisdiction via various levels of commitment, including placement in secure confinement facilities.

Upon cross-examination, the following colloquy occurred between the prosecution and White:

Q. Did you discuss with [Whaley] the crime itself?

A. No, I did not. I discussed the five factors that are included in the reverse waiver report.

Q. And he is obviously, for purposes of this process, as you know he is presumed to be guilty, correct?

A. I'm not sure about that, I assume that's right.

Also testifying at the hearing was Matthew Phillips of the Department of Juvenile Services. When asked by defense counsel whether there was an available facility if Whaley were adjudicated delinquent for armed robbery, he named three out-of-state facilities. Phillips testified that the juvenile might not be placed in a residential facility, but "I can say secure confinement is our most structured and as it relates to public safety that secure confinement would address public safety." The appearance concluded with the following exchange between the court and the witness:

THE COURT: Sir, in your experience has the Department of Juvenile Services approved out-of-state placements when they are requested by the Department?

THE WITNESS: Yes, ma'am.

THE COURT: Really. That's not what I'm told. All right, very good, you may step down.

THE WITNESS: It's a lengthy process. But if there are no facilities in the State of Maryland to place them, we have kids who routinely go to the Pines in Virginia, and that's an out-of-state placement.

THE COURT: So your department doesn't tell you they won't fund that out-of-state placement if that's what's been court ordered or recommended by the Department?

THE WITNESS: No, ma'am.

After the hearing, the court denied the reverse waiver re quest. Addressing the nature of the alleged offense, the circuit judge said: "So for today's proceeding, I believe that Mr. State's Attorney is right, I am to assume that the charges as brought against the individual are true and that the allegations filed form the basis thereof are true, that's my role today." The court observed:

I'm looking at the conduct in question, as I said before I left, this does not appear to me to be an act of immaturity, it's not that one or the other of these individuals got caught up with the group and were just carried along, the facts that I have to accept is they apparently armed themselves in anticipation with BB guns, by mutual agreement approached a victim and without any kind of a—it wasn't like a mutual affray, this victim was just attending to [his] own business and when they attempted to rob the victim[,] the robbery failed and at that point multiple shots were fired striking the victim in the face and head ... It doesn't get much worse than that.

Pointing to Whaley's "disruptive" behavior in school and prior contacts with the juvenile justice system that did not lead to adjudications, the circuit judge said:

I cannot find that there is evidence to suggest to me that treatment in the juvenile facility for this individual would be particularly more effective than the treatments available through the normal adult criminal justice system or that the programs available in DJS would outweigh my concerns regarding public safety. Secure confinement placements are very limited resources in the Department of Juvenile Services. The nature of these charges would indicate to me that we would certainly be looking, if he were a juvenile, at a secure confinement placement and there are very lengthy delays in that process.

Whereas, he is going to be 18 years old in a year and a half. For the offense in question it appears that the criminal justice system would be able to supervise him for up to five years, if that was necessary. He would be well within his adulthood during the mid to later portion of that, and I find the Court can address his needs through detention, supervision in the community, community based interventions or confinement as well as the juvenile justice system could be this point in his life.

So I'm going to find that the defense has not met its burden in his case to demonstrate that transfer of jurisdiction is in the interest of the child or society and I'm going to deny the reverse waiver.

In addition, defense counsel moved to suppress the show-up identification by Mendez–Roque. This motion was also denied.[7]

A jury trial was held in the Circuit Court for Wicomico County on July 9, 2007. At trial, when Mendez–Roque was asked to identify Whaley in the courtroom, Mendez–Roque, at first, could not identify Whaley:

Prosecutor: Do you see either of the two boys in the courtroom this morning that grabbed you and went through your pockets?

---

7. At the same hearing, Maine's request for reverse waiver was denied, along with his motion to suppress the $CO-2$ cartridges found on him by Officer Hughes.

Mendez–Roque: Is he here or around here?

When the prosecutor repeated the question, Mendez–Roque identified Whaley as one of the two assailants.

At trial, the State also introduced a BB gun allegedly connected to the attempted robbery. The BB gun was found the day after the attempted robbery, on Saturday, January 13, 2007, at 409 Elizabeth Street in Salisbury on the property of Matthew Workman. Workman's son came upon the BB gun under a bush on the side of the house. Workman took it to the Salisbury Police Department. Mendez–Roque was shown the BB gun and said that he had never seen it before. Mendez–Roque said that the gun was the same size as the "one" used in the attempted robbery, "but it looked different." When questioned, by the prosecutor, Mendez–Roque stated that there were two weapons. Upon cross-examination, the following exchange occurred:

Defense counsel: "And only one of them shot the BB gun at you, correct?

Mendez–Roque: Yes, the one that was on the sidewalk.

The witness also said that the "one on the sidewalk" was the shorter of the two and that person was not Whaley.[8]

---

**8.** The confusion over whether there were two BB gunmen was apparent from the following exchanges that occurred during Mendez–Roque's testimony:

Prosecutor: What was he aiming at when he shot?
Mendez–Roque: It was the younger one, not this one.
Prosecutor: The second boy—
Mendez–Roque: Yes.
Prosecutor: Is the one that shot at you?
Mendez–Roque: That's when I resisted because I didn't want to give him my knap sack. And then the other one came and they shot at me.

 * * * * * *

Prosecutor: How many of these guns did you see?
Mendez–Roque: It was two.
Prosecutor: Did each of them have a gun?
Mendez–Roque: Yes, yes.
Prosecutor: Did both of them shoot at you?
Mendez–Roque: First one, and then the other.
Prosecutor: Were both guns similar?
Mendez–Roque: Yes. They looked alike.

�these

During closing arguments, the prosecutor remarked that "we have in our community those who will take advantage of some who cannot or aren't familiar with the system, who aren't from here, who are easy pickings, because you have a language barrier to start with. And we find several of the Hispanic community move from place to place." Defense counsel objected that "he [the prosecutor] is making reference to others in the community and his own personal opinion about the Hispanic community and the [sic] whether or not they're a target." The judge overruled the objection.

Shortly after they retired to deliberate, the jurors sent a note to the judge, asking, "If two people are involved, one is holding a gun, can both be charged with armed robbery?" [9] Defense counsel asked the court, "Well, I don't have the aiding and abetting instruction, but is there any way we can look at it and see if we should send that back instead?" Both the prosecutor and defense counsel approved the aiding and abet-

---

Prosecutor: Which one shot at your first?
Mendez–Roque: The youngest one. The one that looked younger.
Prosecutor: Okay.
 And is this the younger one or is the other one the younger one?
Mendez–Roque: The other one.

 \* \* \* \* \* \*

Defense Counsel: Initially, you told the police officer that only one person and, in fact, you said that today, only one person had a gun, is that right?
Prosecutor: That's not what he testified to.
Mendez–Roque: No, I said that both.
Defense Counsel: When you talked to the police officer with the interpreter, you told him that only one person had a gun, isn't that right?
Mendez–Roque: I told them that the shortest one had a gun, but the officer made me a question. He asked me if I thought it was real that if he had the long bullets.
Defense Counsel: Your Honor, I'm going to object to the response. It's beyond—
The Court: All right.

9. During opening statements, the prosecutor had said, "Both actually produced what Mr. Mendez [sic] believed at the time were real handguns." The State had tried its case on the theory that Whaley was a first degree assailant, meaning that Whaley had carried a gun during the attempted robbery.

ting pattern jury instruction, and the judge read it to the jury. Whaley was then convicted of attempted armed robbery, attempted robbery, first degree assault, reckless endangerment, and conspiracy. He was found not guilty of carrying a dangerous concealed weapon and wearing and carrying a dangerous weapon with intent to injure. He was sentenced to 10 years imprisonment for attempted armed robbery and a concurrent 10 year sentence for conspiracy. The other counts were merged with the attempted armed robbery charge.

Additional facts will be discussed below.

## DISCUSSION

### I. The Trial Court's Reverse Waiver Hearing

Whaley argues that the trial court abused its discretion when it considered non-statutorily enumerated factors as the basis for denying Whaley's motion for reverse waiver. Specifically, appellant claims that the circuit court, in gauging the nature of his alleged offense, improperly assumed his guilt and, in weighing his amenability to treatment, impermissibly speculated about the juvenile's likely sentence and the availability of placement options in the juvenile system.

■■ After a juvenile delinquency petition has been filed, the prosecution has the right to request waiver of the juvenile court's jurisdiction so that the juvenile may be tried as an adult in criminal court. Md. Code (1973, 2007 Repl. Vol.), Courts & Judicial Proceedings Article ("Cts. & Jud. Proc.") § 3–8A–06[10]; *In re Johnson,* 17 Md.App. 705, 708, 304 A.2d

---

**10.** Section 3–8A–06(e) of Cts. & Jud. Proc. outlines the factors a juvenile court is to consider "individually and in relation to each other" in determining whether to waive juvenile jurisdiction. The factors are:

(1) Age of the child;

(2) Mental and physical condition of the child;

(3) The child's amenability to treatment in any institution, facility, or program available to delinquents;

(4) The nature of the offense and the child's alleged participation in it; and

(5) The public safety.

859 (1973). When a case is brought in criminal court and an accused child is between the ages of fourteen and eighteen, the juvenile defendant may request a transfer back to the juvenile system. Md. Code (2001, 2007 Repl. Vol.), § 4–202(b) of the Criminal Procedure Article ("Crim. Proc.") During a so-called "reverse waiver" hearing, the court must consider the following factors:

(1) the age of the child;

(2) the mental and physical condition of the child;

(3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children;

(4) the nature of the alleged crime; and

(5) the public safety.

Crim. Proc. § 4–202(d).

■ The burden is on the juvenile to demonstrate that under these five factors, transfer to the juvenile system is in the best interest of the juvenile or society. Crim. Proc. § 4–202(b)(3); and *Kennedy v. State*, 21 Md.App. 234, 240, 319 A.2d 850 (1974). The weighing of the five factors by the circuit court is reviewed by an appellate court for abuse of discretion. *King v. State*, 36 Md.App. 124, 128, 373 A.2d 292 (1977). However, the question of whether an assumption of guilt of the charged juvenile is permitted under Crim. Proc. § 4–202 is purely a legal issue, reviewable *de novo*.

■ Appellant points to the obvious fact that an express directive to a juvenile court to assume guilt in a waiver case is found in Cts. & Jud. Proc., § 3–8A–06(d), but no such provision clearly appears in Crim. Proc., § 4–202 to govern when a criminal court considers a reverse waiver. He seems to argue

---

"The purpose of the juvenile waiver hearing is not to determine guilt or innocence, but rather to determine whether or not the juvenile is fit for juvenile rehabilitative services." § 3–8A–06(d)(1); *In re Franklin P.*, 366 Md. 306, 329–330, 783 A.2d 673 (2001). Although the burden of justifying waiver is on the State, § 3–8A–06(d)(2) provides that, "[f]or purposes of determining whether to waive its jurisdiction under this section, the court shall assume that the child committed the delinquent act alleged."

that this creates a negative implication that the expression of assumed guilt in one statute mandates its intentional exclusion from the other. The State contends that the circuit court, in fact, did not presume guilt, but that in assessing the "nature of the alleged crime" under Crim. Proc. § 4–202(d)(4), "it could not look behind the charges to determine if Whaley was properly before the circuit court in the first place." We believe the relationship of these two statutes does shed meaning on whether an assumption of guilt or, even a lesser prohibition on looking beyond the charges, is permissible under § 4–202(d).

It is often said that the relevant factors for judicial consideration of waiver and reverse waiver are "the same," *Smith v. State,* 399 Md. 565, 582, 924 A.2d 1175 (2007); and *King v. State, supra,* 36 Md.App. at 127, 373 A.2d 292, or are "similar", *Kennedy v. State, supra,* 21 Md.App. at 240, 319 A.2d 850. *But see Miles v. State,* 88 Md.App. 360, 391, 594 A.2d 1208 (1991)(It is incorrect to conclude that if the legal principles governing reverse waivers are the same as those governing waiver, that the unconstitutionality of one scheme affects the other.). However, upon closer examination, we find that the two statutes differ in significant respects, even as their histories have intersected.

The same law that introduced the five-factor waiver analysis created the reverse waiver, with a more generalized standard: "[T]he interests of the child and society." Chapter 432, Laws of 1969. However, in 1975, both statutory schemes were amended in separate pieces of legislation. The five-factor waiver analysis was re-enacted along with new language providing that, "[f]or purposes of determining whether to waive its jurisdiction, the court shall assume that the child committed the delinquent act alleged." Chapter 554, Laws of 1975.[11]

---

11. Chapter 554 did alter the "nature of the offense" factor to add "and the child's alleged participation in it." Two years later, the General Assembly amended the waiver statute to require the five factors to be determined "individually and in relation to each other on the record." Chapter 490, Laws of 1977.

At the same time, the amorphous standard for reverse waiver was particularized with a five-factor analysis that mirrored in many, but not all, respects the waiver standard. Chapter 830, Laws of 1975. The word "alleged" was attached to the "nature of the crime" and, most importantly, there was no mention of an assumption of guilt.[12] Nevertheless, it is possible to argue that the 1975 legislation merely incorporated a guilty assumption in waiver situations from earlier caselaw, see *Matter of Murphy*, 15 Md.App. 434, 435–36, 291 A.2d 867 (1972), and that the Legislature, by adopting the five-factor waiver analysis for reverse waiver cases, intended the same assumption to apply. However, this is not the most likely explanation for the Legislature's actions.

Chapter 554 (HB 384) and Chapter 830 (HB 1654) were enacted during the same session of the General Assembly, passing in each chamber within days of each other. The bills were considered by the same committees in the House and Senate.[13] Each related to the same general subject and could easily have been included in a single bill. Most importantly, Chapter 830 was replicating, in large part, components of the waiver formula addressed in Chapter 554. Under these circumstances, the failure to include an assumed guilt provision in Chapter 830 could not be seen as anything but an intentional decision of the General Assembly. The Court of Appeals in *In re: Samuel M.*, 293 Md. 83, 96, 441 A.2d 1072 (1982), recognized that the assumption of guilt provision was different from the other statutory criteria, such as the nature of the offense. The opinion in that case also observed that the Legislature had a range of options it could have selected to deal with the waiver of juvenile court jurisdiction, other than the use of a presumption. *Id.* at 89–92, 441 A.2d 1072. This

---

**12.** Chapter 830 also changed the generalized standard governing reverse waiver determinations by eliminating the "and" between "child" and "society" and adding an "or."

**13.** For HB 483, *see* 1975 H. Journ. 386 and 1975 S. Journ. 3178. For HB 1654, *see* 1975 H. Journ. 1600 and 1975 S. Journ. 3622.

suggests that the selection of a presumption by the Legislature—or its omission—was not a casual decision.

There are valid reasons for including an assumption of guilt in one statutory scheme, but not the other. A presumption of guilt in a waiver setting is mitigated by the fact that the burden of justifying the transfer of jurisdiction still remains on the State, that the ultimate issue is the child's fitness for rehabilitation, and that, after waiver, a different court considers actual guilt or innocence. Such a presumption in the criminal court, where the burden is on the juvenile, could create its own set of problems. It could force a defendant to preview his defense in an attempt to obtain the reverse waiver. In addition, the same judge hearing the reverse waiver and assuming guilt (albeit for a limited purpose) may be the one who hears the criminal case.[11] Finally, an assumption of guilt for consideration of a reverse waiver could skew the analysis of the five statutory factors; because the "nature of the alleged offense" factor will almost invariably be found by the court and be linked to the "public safety" factor. It is no surprise that one assumed guilty of a serious offense will frequently be deemed to be a threat to public safety and not amenable to treatment. This seems to run contrary to the authorization to transfer jurisdiction to the juvenile court (Crim.Proc. § 4–202(b)(3)) when it is "in the interest of the child." *Cf. Matter of Wooten*, 13 Md.App. 521, 528, 284 A.2d 32 (1971)("However relevant the nature of the delinquent act and the circumstances surrounding its commission may be in making a proper disposition [in a waiver case], those factors cannot be applied without regard to, or wholly apart from, the child's best interests and those of the public viewed in light of the purposes underlying the juvenile law."), and *In re Samuel M., supra*, 293 Md. at 96, 441 A.2d 1072 ("Our statute focuses on the actor, the juvenile, not on the purported delinquent act.").

---

14. Here, the motions judge was not the trial judge.

■ We believe the record reflects just such a disposition.
The State contends that the court did not assume Whaley's
guilt, but the prosecution argued for the presumption, the
motions judge agreed with the contention and then indicated
at several points that she was required to assume that appel-
lant was guilty of a charge that characterized him as armed
and shooting at the victim. In hindsight, on the basis of a full
evidentiary record at trial and a jury's assessment, we now
know that this presumption may have been overstated, if not
contradicted. On the other hand, we cannot require a motions
judge to be clairvoyant. It is not error to decide a reverse
waiver question on the basis of a skeletal, rather than a full
record. *But cf. Matter of Waters,* 13 Md.App. 95, 104, 281
A.2d 560 (1971)("This is not to say that evidence concerning
the alleged act is not to be received at the waiver hearing.").[15]
Here, however, there were some early indications that Whaley
may not have been the principal perpetrator.[16] The $CO_2$
cartridges were found on Maine, not Whaley, and were the
subject of a suppression hearing conducted immediately after
the reverse waiver hearing. At the suppression hearing on
the show-up, Officer Harrington testified that only one of the
two males had a BB gun.[17] Only one BB gun was recovered

---

15. Although *Waters* is a waiver case, we believe its views on the ability
of a court to hear evidence about the circumstances of the offense are
equally applicable to reverse waiver situations. Thus, the State is
incorrect in arguing that the court cannot look beyond the charges.

16. Police reports are sometimes used to gauge the nature of the offense
in a waiver setting. *See In re: Samuel M., supra,* 293 Md. at 85, 441
A.2d 1072. There is no police report in the record of this case. Thus,
we do not know whether the motions judge considered it or based her
assessment of this factor exclusively on the Statement of Charges,
which eventually proved to be only partially accurate. *See* n. 4, *supra.*

17. At the May 2, 2007 hearing, the following colloquy occurred with
respect to Officer Harrington's testimony:

The Court: Well, my understanding was he said it was a BB like
handgun or a handgun that—he said that the victim reported that he
was approached by juvenile black males with a handgun, he was shot
several times with it, gray shirt—

Defense Counsel: Your Honor, I wrote down that he said one person
had a gun.

and that was on the day after the attempted robbery. We need not scrutinize each fact with respect to the extent of Whaley's involvement in the charged offenses. The circuit court believed it was required to assume that Whaley was guilty of those offenses. This was not authorized by § 4–202 of Crim. Proc. and the assumption of guilt was a legal error.

■ Appellant also contends that the motions judge impermissibly speculated about Whaley's likely sentence and the availability of placement options in the juvenile system, arguing that these are non-statutory factors. Because this case must be remanded for another reverse waiver determination, this is an issue that we are not required to address. However, for the guidance of the circuit court on remand, we point out that although the court is not obliged to follow a DJS recommendation, *In re Murphy,* 15 Md.App. 434, 442, 291 A.2d 867 (1972), we have noted the importance of DJS reports in determining the amenability of the child to treatment. *Brown v. State,* 169 Md.App. 442, 451, 901 A.2d 846 (2006). Without a favorable report from DJS, a reverse waiver request faces almost certain denial. *Id.*

In this case, DJS officials, in their report and through testimony, indicated that Whaley was amenable to treatment and could be placed in a secure facility, possibly out-of-state. This was countered by the motions judge's statement that she was "told" DJS would not approve or fund such placement, that there would be a "very lengthy delay" in such a placement, and that treatment available through the normal adult criminal system would be as effective as a DJS placement— facts not immediately verifiable at the hearing.[18] The court

---

The Court: I have one handgun is what he said, one handgun, yes. And that he was wearing gray with black hoods, gray jackets or grayish type shirts with black hoods.

**18.** In *In re Demetrius J.,* 321 Md. 468, 583 A.2d 258 (1991), the Court of Appeals said that a juvenile court could not direct that a child be sent to a specific facility at State cost. The Court also noted:

We take into account that it is DJS, not the court, which is charged with administration of the State juvenile, diagnostic, training, deten-

also clearly viewed Whaley's prior contacts with the juvenile
system and disruptive behavior at school as indicative of
treatment failures, even though appellant was never adjudicat-
ed or treated by DJS. In contrast, prior appellate cases on the
amenability to treatment in waiver and reverse waiver cases
have tended to find this factor trumped when the juvenile has
failed after more formal adjudication and interventions than
occurred here. *See e.g., In re: Samuel M., supra,* 293 Md. at
86, 441 A.2d 1072 (Prior incarceration at Maryland Training
School); *King v. State, supra,* 36 Md.App. at 129, 373 A.2d 292
(Prior probation); *In re Murphy, supra,* 15 Md.App. at 441,
291 A.2d 867 (Prior probation).

■ Because this case is being remanded for a new reverse
waiver proceeding, a new DJS study will likely be ordered.
The new study could address these issues and may alleviate
the concerns noted by the motions judge.[19] As this Court
noted in *Kennedy v. State, supra,* 21 Md.App. at 241, 319 A.2d
850, if on remand the facts called for a waiver to the juvenile
court, then the criminal trial would be a nullity. On the other
hand, *Kennedy* said that if the court on remand determines

---

tion, and rehabilitation institutions. DJS could not properly adminis-
ter these institutions if it could not control the monies to be spent on
them, nor could it adequately fulfill the other obligations assigned to
it.
*Id.* at 475, 583 A.2d 258.

19. The reverse waiver proceeding, particularly consideration of the age
factor, could be complicated by the fact that Whaley is now 18.
However, this fact would not prevent the court from making a decision
on the reverse waiver. *See e.g., Kennedy v. State,* 21 Md.App. 234, 319
A.2d 850 (1974). If the reverse waiver is granted, the juvenile court
could still exercise jurisdiction over appellant, even though he has now
reached the age of 18. A juvenile court may still retain jurisdiction
over a person who has committed a criminal offense before the age of
18. *See* § 3–8A–07(a) Cts. & Jud. Proc. Article. Additionally, "[i]f a
person is alleged to be delinquent, the age of the person at the time the
alleged delinquent act was committed controls the determination of
jurisdiction under this subtitle." Cts. & Jud. Proc. § 3–8A–05(a). Ju-
risdiction for a person for whom the court obtains jurisdiction contin-
ues until that person reaches 21 years of age. Cts & Jud. Proc. § 3–8A–
07 (a). Since Whaley was 16 years and four months at the time of the
alleged delinquent act and Whaley is still under the age of 21, he would
still be within the jurisdiction of the juvenile court.

that waiver was not appropriate, then "the judgement of conviction shall stand." *Id.* In *Kennedy,* unlike this case, no reverse waiver hearing was held. Thus, it is not clear whether this is the procedure to be applied here. Nevertheless, because after remand appellant's conviction may still be in play, we will address the question of whether the trial court committed reversible error.

## II. Prosecutor's remarks made during closing argument

■ Appellant argues that his conviction should be reversed because the trial court allowed impermissible and inflammatory prosecutorial remarks to be made during closing argument.

During the trial, in front of the jury, the prosecutor made the following remarks during his closing statement:

Some of you may think, gee whiz, this is a young fellow, this is a pretty serious offense. He is a young fellow. And it is a serious offense. You know, unfortunately, *we have in our community those who will take advantage of some who cannot or aren't familiar with the system, who aren't from here, who are easy pickings, because you have a language barrier to start with. And we find several of the Hispanic community move from place to place.*

(Emphasis added.). Reviewing the record and the remarks made, we agree that the remarks were unfairly prejudicial and require reversal.

■ The State contends that Whaley's present attack on the closing argument has not been preserved for appellate review. Appellant's counsel at trial protested the prosecutor's remarks, stating, "He is making reference to others in the community and his own personal opinion about the Hispanic community and the whether [sic] or not they're a target. And I don't think that that is appropriate ... closing in the State." The State contends that Whaley now seeks to challenge these remarks, as a prohibited "golden rule" argument, *i.e.,* one in which a litigant asks members of the jury to place themselves in the shoes of the victim, or in which an attorney appeals to the jury's own interests. *Lee v. State,* 405 Md. 148, 171, 950

A.2d 125 (2008). In our view, appellant has sufficiently pre-
served his challenge of prejudice from the remarks, even if
they do not amount to a "golden rule" argument.

 In general, during closing argument,

The prosecutor is allowed liberal freedom of speech and
may make any comment that is warranted by the evidence
or inferences reasonably drawn therefrom. In this regard,
generally, ... the prosecuting attorney is as free to com-
ment legitimately and to speak fully, although harshly, on
the accused's action and conduct if the evidence supports his
comments, as is accused's counsel to comment on the nature
of the evidence and the character of the witnesses which the
[prosecution] produces.

\* \* \*

While arguments of counsel are required to be confined to
the issues in the cases on trial, the evidence and fair and
reasonable deductions therefrom, and to arguments of op-
posing counsel, generally speaking, liberal freedom of
speech should be allowed. There are no hard-and-fast
limitations within which the argument of earnest counsel
must be confined—no well-defined bounds beyond which the
eloquence of an advocate shall not soar. He may discuss
the facts proved or admitted in the pleadings, assess the
conduct of the parties, and attack the credibility of wit-
nesses. He may indulge in oratorical conceit or flourish and
in illustrations and metaphorical allusions.

*Spain v. State*, 386 Md. 145, 152–53, 872 A.2d 25 (2005)
(quoting *Degren v. State*, 352 Md. 400, 429–430, 722 A.2d 887
(1999)).

 While there is "great leeway" given to prosecutors
to conduct their closing statements, *Lawson v. State*, 389 Md.
570, 591, 886 A.2d 876 (2005),

Whether it be in opening statement or in summation, ap-
peals to class prejudice or passion are improper and may so
poison the minds of jurors that an accused may be deprived
of a fair trial.

\* \* \*

Of course, not every ill-conceived remark made by counsel, even during the progress of the trial, is cause for challenge or mistrial. What exceeds the limits of permissible content depends on the facts in each case, even where the remarks may fall into the same general classification.

*Wilhelm v. State*, 272 Md. 404, 414–15, 326 A.2d 707 (1974) (Citations and quotations omitted.). Whether prejudicial remarks constitute reversible error depends on the closeness of the case, the centrality of the issue affected by the error, and the steps taken by the judge to mitigate the effects of the error. *Id.* at 416, 326 A.2d 707.

Looking at the record, we think the remarks made by the prosecutor had the tendency to appeal to class prejudice and passion and were highly prejudicial to appellant's case. The jurors were invited by the prosecutor's remarks to punish appellant for the wrongdoings committed against the Hispanic community. No curative instruction was offered by the court and general instructions regarding closing arguments would not have been sufficient. The remarks may have deprived appellant of a fair trial, given the somewhat conflicting identification and confusing testimony given by the victim in this case.[20] For these reasons, we are unable to conclude that these remarks were harmless. Thus, we reverse appellant's conviction and remand for the court to conduct a reverse waiver proceeding.[21]

---

**20.** During the trial the victim, Mendez–Roque, initially was unable to clearly identify appellant as one of his attackers. Mendez–Roque's version of the events changed during his testimony, including the number of guns that he saw and the physical descriptions of his attackers. Additionally, there was absolutely no physical evidence presented by the State at trial which linked appellant to the crime scene.

**21.** Because we reverse Whaley's conviction on the closing argument ground, there is no need to address his claim that the State impermissibly changed the theory of the case after the beginning of juror deliberations.

JUDGMENT OF THE CIRCUIT COURT FOR WICOMI-CO COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY WICOMICO COUNTY.