583 A.2d 258

**In re DEMETRIUS J., Darvanion M., Shawn J.**

**Nos. 100–102, Sept. Term, 1990.**

Court of Appeals of Maryland.

Jan. 2, 1991.

Judson P. Garrett, Jr., Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Ronald M. Levitan, Deborah Farmer Minot, and Cecilia Januszkiewicz, Asst. Attys. Gen., all on brief), Baltimore, for petitioners.

Stuart O. Simms, State's Atty. (Mary V. McNamara, Asst. State's Atty., both on brief), Baltimore, for respondent.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for amicus curiae, Susan P. Leviton for Advocates for Children and Youth.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI *, JJ., and CHARLES E. ORTH, Judge of the Court of Appeals (retired, Specially Assigned), and ALAN M. WILNER, Judge of the Court of Special Appeals (Specially Assigned).

CHARLES E. ORTH, Judge, Retired Specially Assigned.

We are called upon by these appeals, consolidated for our review, to resolve a question concerning the authority prescribed by the Legislature for the disposition of a child[1] adjudicated to be delinquent.[2] Specifically, we are asked to determine:

> Whether § 3–820 of the Courts and Judicial Proceedings Article authorizes a juvenile court to commit a delinquent child to the custody of the Department of Juvenile Services for placement in a specific private facility and to order the Department to pay the cost of that placement?

The question presents the heart of the controversy. To resolve it we shall overview the pertinent parts of two statutes: (1) the Juvenile Causes Act, Md.Code (1973, 1989 Repl.Vol.), §§ 3–801 et seq. of the Courts and Judicial Proceedings Article (CJ); and (2) the Juvenile Services Act, Md.Code (1957, 1988 Repl.Vol., 1990 Cum.Supp.), Art. 83C, §§ 1–101 et seq.

---

\* At the time these cases were heard and conferenced, Karwacki, J., a judge of the Court of Special Appeals of Maryland, was specially assigned to this Court. At the time of the decision and adoption of this opinion, he had been commissioned and had qualified as a judge of this Court.

1.  " 'Child' means a person under the age of 18 years." Md.Code (1973, 1989 Repl.Vol.), § 3–801(d) of the Courts and Judicial Proceedings Article (CJ).

2.  " 'Delinquent child' is a child who has committed a delinquent act and requires guidance, treatment, or rehabilitation." CJ § 3–801(*l*).
    " 'Delinquent act' means an act which would be a crime if committed by an adult." CJ § 3–801(k).

## THE JUVENILE CAUSES ACT

The court[3] ordering disposition of a child adjudicated delinquent may:

Subject to the provisions of paragraph (2) of this subsection, commit the child to the custody or under the guardianship of the Department of Juvenile Services, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency on terms that the court considers appropriate to meet the priorities set forth in subsection (b) of this section, *including designation of the type of facility where the child is to accommodated,* until custody or guardianship is terminated....

CJ § 3–820(c)(1)(ii) (emphasis added). Paragraph (2) of subsection (c) provides:

A child committed under paragraph (1)(ii) of this subsection may not be accommodated in a facility that has reached budgeted capacity if a bed is available in another comparable facility in the State, unless the placement to the facility that has reached budgeted capacity has been recommended by the Department of Juvenile Services.

Subsection (b) of § 3–820 sets forth:

The priorities in making a disposition are the public safety and a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest.

## THE JUVENILE SERVICES ACT

The Department of Juvenile Services (DJS) is "a principal department of State government." Code, Art. 83C § 2–101(a). The head of DJS is its Secretary, who is responsible for its operation, § 2–102(a) and (b), and for its budget and for the budget of each unit in the Department,

---

**3.** " 'Court' means the circuit court of a county or Baltimore City sitting as the juvenile court. In Montgomery County, it means the District Court sitting as the juvenile court." CJ § 3–801(i).

§ 2–104(a). DJS is "the central administrative Department for ... [t]he State juvenile, diagnostic, training, detention, and rehabilitation institutions." Section 2–111(a)(2). DJS may

(1) Designate, as its agent for the purposes of this article, any public or private agency or organization in this State; and

(2) Spend funds:

(i) To aid that agent or to buy services from it; or

(ii) If adequate services are not available in this State, to buy services from any agency or organization outside this State.

Section 2–114. Except as expressly provided otherwise, the Secretary may

transfer, by rule, regulation, or written directive, any function, staff, or funds from any unit in the Department to the office of the Secretary or another unit in the Department.

Section 2–104(g). It is, of course, self-evident that DJS may spend only those funds available to it by law and must operate within those funds.

The Secretary is charged with developing "a State Comprehensive Juvenile Services 3–year Plan," prior to 1 January 1990, § 2–104(e)(3)(1). The Plan "shall be revised for each subsequent calendar year for three years and shall be submitted to the General Assembly by February 1 of each year," *id.*, subsections (e)(3)(i) and (ii). Subsection (e)(3)(i) requires, among other matters, that the Plan shall:

(2) Set out the needs of the various areas of services for clients ...; [and]

(3) Establish priorities for the different services needed....[4]

---

**4.** Both the Juvenile Causes Act and the Juvenile Services Act reflect the deep concern of the General Assembly for children. The Juvenile Causes Act declares its purposes to be:

(1) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions

## LEGISLATIVE INTENT
### The Guidelines

In order to answer the question before us, we must divine the intent of the legislature with respect to the disposition of a delinquent child. *See* Miller & Levinson, *Ghost Hunting: Searching for Maryland Legislative History,* 22 Md.Bar J. 11–16 (July–August 1989); M. Miller, *Ghost Hunting: Finding Legislative Intent in Maryland, A Check List of Sources* (October 1984) (unpublished manuscript available in the Maryland State Law Library). The guidelines for statutory construction were set out by Judge Adkins speaking for the Court in *Morris v. Prince George's County,* 319 Md. 597, 573 A.2d 1346 (1990):

There is no doubt that the beginning point of statutory construction is the language of the statute itself. Obviously, " 'what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal.' " When we look at the statutory language, we attempt to give effect to all the words in the statute. And sometimes it may not be necessary to go further than the scrutiny of statutory language, for

---

of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;

   (2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior;

   (3) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;

   (4) If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents;

   (5) To provide judicial procedures for carrying out the provisions of this subtitle.

CJ § 3–802(a). Subsection (b) requires that the Act "be liberally construed to effectuate these purposes."

The aims and purposes of the Juvenile Services Act are the same as those of the Juvenile Causes Act. The Legislature made clear that "[i]t is the policy of the State that the Department [of Juvenile Services] comply with the provisions of § 3–802 of the Courts and Judicial Proceedings Article." Md.Code (1957, 1988 Repl.Vol., 1990 Cum. Supp.), Art. 83C § 2–101(b).

the language itself may be sufficiently expressive of the legislative purpose or goal.

But our endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment. In the conduct of that enterprise, we are not limited to study of the statutory language. The plain meaning rule " 'is not a complete, all-sufficient rule for ascertaining a legislative intention....' " The "meaning of the plainest language" is controlled by the context in which it appears. Thus, we always are free to look at the context within which statutory language appears. Even when the words of a statute carry a definite meaning, we are not "precluded from consulting legislative history as part of the process of determining the legislative purpose or goal" of the law.

*Id.* at 603–604, 573 A.2d 1346 (citations and footnote omitted). *See Franklin Square Hosp. v. Laubach,* 318 Md. 615, 619–620, 569 A.2d 693 (1990).

### The Construction

When the statutes are considered in the light of the guidelines, the legislative scheme shines bright and clear. Governmental rights and obligations in juvenile causes are rationed between the Judiciary Department and the Executive Department. When a juvenile petition filed by a State's Attorney alleges that a child has committed a delinquent act, the court must determine whether the allegation has been proved beyond a reasonable doubt. CJ § 3–819(b)(1); Md.Rule 914(e)(1). If the allegation has been duly proved, the court may commit the child to the custody of DJS, and, in doing so, may designate the type of facility where the child is to be accommodated. The court may not, however, designate a specific facility; such designation is the prerogative of DJS.

This view is entirely consistent with the rights and obligations of DJS and its Secretary. It is difficult to perceive how the functions of DJS could be properly fulfilled if it

could not control the monies appropriated to it or which otherwise came into its hands. The 3-year Plan which the Secretary was required to develop, revise, and submit to the Legislature each calendar year would be thrown into utter disarray if the Secretary were obliged to spend the Department's funds as dictated by a court. The estimate of the needs of the various areas of services would be meaningless, and establishment of priorities for the different services needed would be futile if the funds allocated for such needs were expended without the Secretary's control. We take into account that it is DJS, not the court, which is charged with administration of the State juvenile, diagnostic, training, detention, and rehabilitation institutions. DJS could not properly administer these institutions if it could not control the monies to be spent on them, nor could it adequately fulfill the other obligations assigned to it.

Whether DJS has funds available to support a child in a private facility or could tap some source to obtain such funds, begs the question. It may well determine that the monies would be better spent elsewhere to serve the purposes clearly announced by the legislature. It is evident on the face of the statutes that such a determination rests with DJS. As we have seen, it is the DJS which is authorized by the Legislature to designate "any public or private agency or organization in this State" and to spend funds "[t]o aid that agency or to buy services from it ..." or, "[i]f adequate services are not available in this State, to buy services from any agency or organization outside this State." Code, Art. 83C § 2–114. The plain language of the statute places these matters within the sound discretion of DJS. There is no indication, expressed or implied, that the discretion may be exercised by a court or any other agency, entity, or person.

The Juvenile Causes Act authorizes the court to commit a delinquent child to the custody of DJS and permits it, upon such commitment, to designate "the type of facility where the child is to be accommodated." CJ § 3–820(c)(1)(ii). But

it does not go so far as to permit the court to designate the specific facility.

The short of it is that the language of the statutes in the context in which it appears, considered with the legislative purpose, the general aim or policy, the ends to be accomplished and the evils to be redressed by the enactments, lead inevitably to the conclusion that the Legislature intended that the particular facility in which a delinquent child may be placed is within the exclusive discretion of DJS.

The history of what is now CJ § 3–820(c) supports this view. Prior to 1986, the court was empowered under then § 3–820(b)(2) to

[c]ommit the child to the custody or under the guardianship of the Juvenile Services Administration [now DJS], a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency....

In the wake of a decision of this Court, *In re Appeal No. 653, Term 1975*, 277 Md. 212, 352 A.2d 845 (1976), and two decisions of the Court of Special Appeals, *Dep't of Health v. Prince George's Co.*, 47 Md.App. 436, 423 A.2d 589 (1980), *cert. denied sub nom. Tom and June G. v. Dept. of Health*, 290 Md. 714 (1981), and *In re George G.*, 64 Md.App. 70, 494 A.2d 247 (1985), which indicated that the court was not authorized under the statute to mandate the terms of a child's commitment to DJS, a spate of bills was introduced in the 1986 General Assembly. The question concerning the authority to designate a specific facility resulted in a compromise reflected in the present statute. The statute, as we have seen, permits the court to name the type of facility but generally bestows no authority on the court to specify a particular facility. The compromise was encouraged in significant part by the hope that it would avoid constitutional considerations. *See* SB 348, SB 661, HB 500, HB 635, all 1986. *See also* the fiscal note and the revised fiscal note of the Division of Fiscal Research to SB 348; the position memoranda of the Department of Health and Mental Hygiene regarding SB 348, HB 500, and HB 635 presented to

the respective Senate and House Committees; the position statement from the Baltimore County Department of Fiscal Services to the Baltimore County Legislative Liaison Office dated 11 February 1986; position statement from the Baltimore County Office of Law dated 27 February 1986; letter from the Attorney General to the Executive Assistant to the Governor dated 21 January 1986 regarding HB 500; letter from the Attorney General to the Governor dated 23 May 1986 regarding HB 635 and SB 348.

## STATEMENT OF THE CASES SUB JUDICE

The three cases before us traveled the same path to this Court. In each of them, upon petition of the State's Attorney for Baltimore City, the court adjudicated the named child to be delinquent. Upon a disposition hearing in each case, the court, by means of an identically-worded printed form entitled "Order for Commitment of Juvenile," committed the child over the signature of the presiding judge, "to the care and custody of the Maryland Department of Juvenile Services." It further ordered that the child "be delivered to the appropriate Maryland Department of Juvenile Services facility." [5] At the bottom of each form, however, there appeared in handwriting over the signature of the judge, the flat command, "Respondent to be placed at the Glen Mills School." Glen Mills School is a private facility located in Pennsylvania.

### *Demetrius*

The inception of the command of the court to place Demetrius in the Glen Mills School occurred when the

---

**5.** The form gave the DJS the right

> to consent to such medical, surgical, and hospital care and treatment as may from time to time be determined to be in [the child's] best interest, subject to the further order of this court....

The form included an order that reasonable efforts required by 42 United States Code Annotated Section 671(a)(15) concerning preplacement efforts to prevent or eliminate the need for removal from the home have been made and post-placement efforts to enable a return to the home, applicable in the circumstances of the child, will continue to be made.

master who conducted the child's adjudication hearing ordered DJS to make an investigation and render a report for the disposition of the child. Specifically, DJS was ordered to refer Demetrius for possible placement in Glen Mills or in the Department's Youth Centers.[6] The indicated referrals were made by a juvenile counselor,[7] and Demetrius was accepted by both facilities. At the disposition hearing, however, a juvenile counselor informed the court that DJS could not place Demetrius in Glen Mills because of a lack of funds. Despite requests by an Assistant State's Attorney and Demetrius' counsel to place the child in Glen Mills, the master recommended that he be placed in the Youth Centers. Demetrius filed an exception and requested a hearing. At the hearing, counsel for Demetrius told the court that although DJS had first planned to place the child in Glen Mills, because of a lack of funds DJS now recommended that he be placed in the Youth Centers. After hearing from an Assistant State's Attorney, the court ordered placement in Glen Mills. DJS promptly petitioned the court to vacate or modify the order. The petition was denied.

### Darvanion

At the time of the disposition hearing of Darvanion, DJS had been ordered by the court to refer him to Glen Mills and had been further ordered to send him to the school for a "diagnostic evaluation" upon Glen Mills' offer to perform the evaluation without payment. The juvenile counselor

---

6. The Legislature authorized DJS "may establish and operate the facilities that are necessary to diagnose, care for, train, educate, and rehabilitate properly children who need these services." Md.Code (1957, 1988 Repl.Vol., 1990 Cum.Supp.), Art. 83C, § 2–117(a)(1). The facilities set out include "[t]he youth centers." *Id.,* § 2–117(a)(2)(vi). Each facility named shall operate under the control and general management of DJS. *Id.,* § 2–118.

7. A "Juvenile counselor" is "the person assigned to the court by the Department of Juvenile Services to provide probation and aftercare services." COMAR 16.03.01.02(16).

submitted a memorandum recommending placement in the Youth Centers. The counselor averred in the memorandum:

If I genuinely believed that Glen Mills was the only program to meet this young man's needs, I would not hesitate to recommend it, and I would do so, even in the face of the extant budget crunch, with all the persuasive power I could muster. However, I do not believe this is true in this case and I frankly think it would be cavalier and fiscally irresponsible in light of present economic realities, to make such a recommendation when a perfectly acceptable program, already budgeted for, exists.

Nevertheless, after a hearing at which no testimony was taken, the court committed Darvanion to the DJS with the command that he be placed in Glen Mills. The petition of DJS to modify or vacate the order was denied upon hearing.

### Shawn

Shawn's placement in Glen Mills came about in this manner. After he was adjudicated delinquent, there were negotiations in which DJS played no part. As a result of the negotiation, Shawn was referred to Glen Mills. The juvenile counselor informed the Assistant State's Attorney that a placement for Shawn had been secured in the Youth Centers. At no time did DJS refer Shawn to Glen Mills or recommend that he be placed in that facility. The court committed Shawn to DJS and sent him to Glen Mills for "diagnostic evaluation," which Glen Mills agreed to perform without payment. At the review proceeding which followed, the request of counsel for DJS to participate in the proceedings was denied. The juvenile counselor, however, informed the court that placement for Shawn in the Youth Centers had been obtained. The court continued the commitment to DJS and ordered the Department to place Shawn in Glen Mills, which had agreed to accept him. It was stipulated that DJS never recommended placement in Glen Mills and that the Department had secured an alternative placement for Shawn. The court refused to vacate or modify its order.

DJS noted an appeal to the Court of Special Appeals in each case from the respective orders denying the petitions to vacate or modify the orders of commitment. Upon petition of DJS in each case we granted certiorari before decision of the intermediate appellate court.

## CONCLUSION

In the light of our interpretation of the statutes with regard to the placement of a delinquent child, we conclude that the court's commands to place the children in Glen Mills were improper. We observe that the comments made by the presiding judges regarding the placements do not persuade us to the contrary.

As to Demetrius the court recognized that it did not have the authority to designate placement in a specific facility. The court attempted to avoid this restriction by reasoning that it was not really directing DJS to place the child in a particular facility. Rather, the court asserted, it used the phrase "the Glen Mills School" merely to describe the characteristics of the "type of facility" where Demetrius was to be placed. The court explained:

[I]t's always been my understanding as a juvenile judge and as the administrative judge of this court that I had the authority to designate the type of institution that a juvenile was to be committed to and the statute confirmed that and that's all I have done here. By using the key words, Glen Mills, I have designated a bundle of characteristics of an institution, which I felt, after everyone agreed, had the appropriate characteristics for Demetrius, for his well-being, his best interest, for society's best interest, for Juvenile Services' best interest.

As DJS points out, "[t]he court, however, neither described nor made any findings of fact as to this 'bundle of characteristics.'" We think that the court gave DJS no choice as to the facility. We are not in accord within the judge's rationale for his action.

As to Darvanion, the court at first relied on the fact that DJS had initially recommended placement in either Glen Mills or the Youth Centers. The court said that it was "accepting that and taking the alternative recommendation and placing [Darvanion] in the Glen Mills program." But this was in the face of a memorandum submitted shortly before the hearing in which the juvenile counselor urged that the child be placed in the Youth Centers and not in Glen Mills. At the hearing on the petition to vacate or modify the order, the court said, without amplification, that "under certain circumstances, the court does under the statute or can under the statute ... make the kind of decision that was made in this case...."

As to Shawn, at the hearing on the petition to vacate or modify the placement order, the judge, who had also presided in the Darvanion case, opined:

I still think that this court has as a duty and obligation to do that which is in the best interest of the [child]....
I am under the belief that the statute allows me to do what I did in this case as well based upon a total reading of the statute....

We note that DJS did not agree to the placement of the children in Glen Mills, nor did it condone or recommend such placement. On the contrary, it was persistent in its assertion of its right to designate the specific facility.

## DECISION

The answer to the question is that CJ § 3–820, considered in the light of other relevant statutes, does not authorize the court, in committing a delinquent child to the custody of the Department of Juvenile Services, to order that the child be placed in a specific private facility at the expense of the Department. Therefore, the orders of the court placing the children in the Glen Mills School were erroneous.

In each case, the judgment of the Circuit Court for Baltimore City denying the petition of the Department of Juvenile Services to vacate or modify the Order of Commit-

ment is affirmed with respect to the commitment of the child to the care and custody of the Department of Juvenile Services and reversed with respect to the placement of the child in the Glen Mills School.

IN EACH CASE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY DENYING THE PETITION OF THE DEPARTMENT OF JUVENILE SERVICES TO VACATE OR MODIFY THE ORDER OF COMMITMENT IS AFFIRMED IN PART AND REVERSED IN PART AS SET OUT IN THIS OPINION;

EACH CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTION TO VACATE THE ORDER PLACING THE CHILD IN THE GLEN MILLS SCHOOL; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.[8]

8. The writs of certiorari present a second question:

Whether the separation of powers mandated by Article 8 of the Maryland Constitution, Declaration of Rights prohibits the legislature from authorizing the juvenile courts to commit delinquent children to specific private facilities and to order the Department of Juvenile Services to pay the cost of those placements.

Because we have concluded on nonconstitutional grounds that the orders of the Circuit Court for Baltimore City to place the children in the Glen Mills School were prejudicially erroneous, we do not reach the constitutional issue presented. *Brittingham v. State,* 306 Md. 654, 660, 511 A.2d 45 (1986).