REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2726

September Term, 2014

_____

IN RE: W.Y.

_____

Berger,
Nazarian,
Zarnoch, Robert A.,
        (Retired, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  July 26, 2016

Section 5-607 of the Family Law Article ("FL") of the Maryland Code allows a court to order an out-of-state placement for a child who has been adjudicated delinquent *so long as* the child is given a hearing with notice to his parent or guardian *and*, after that hearing, the juvenile court makes specific findings. W.Y. ("W") was a juvenile (he's now over 18) who pled involved to his most recent set of charges and was adjudicated delinquent. Using a form order edited by hand, the Circuit Court for Prince George's County ordered W placed in a facility in Pennsylvania; he contends on appeal that the process and findings underlying the placement decision failed to comply with FL § 5-607. In the time since the court entered its order, W completed the out-of-state program, and we agree with both parties that the case is moot. Nevertheless, there are no reported Maryland appellate opinions to guide the juvenile courts in their application of this statute, and because the issues are important and likely to evade review, we find this an appropriate case to exercise our discretion to address the merits of W's contentions.

## I. BACKGROUND

W has a long history with the juvenile justice system. He was first adjudicated delinquent on March 13, 2012, also by the Circuit Court for Prince George's County, after pleading involved to a count of robbery. While wearing a black ski mask and wielding

what the victim believed to be a handgun (later found to be a BB gun), W demanded the victim's book bag and laptop. The victim recognized W from prior encounters, and even called W by name during the robbery. When police officers stopped him shortly after the incident, W admitted to the robbery and consented to a search of his home, during which the victim's property was recovered. The court, sitting as a juvenile court, committed W to the Department of Juvenile Services ("DJS") and recommended a Level B placement, which in Prince George's County meant a staff-secured, non-community residential facility.[1] DJS placed W at the Victor Cullen Center[2] in Sabillasville, Frederick County, Maryland, where he remained from May 2, 2012 until he was successfully discharged on October 17, 2012. Upon discharge, the juvenile court rescinded the commitment order and placed W on probation.

W was arrested again in the early hours of May 26, 2014. Police found W sitting on the steps of a townhome in Landover, Maryland, and approached him because he matched the description of the suspect in a nearby robbery. As they neared, W stood up, drew a .38 caliber handgun (containing three live rounds) from the waistband of his pants,

---

[1] Level B and level A placements are non-community residential facilities, with level B being staff-secure and level A hardware-secure.

[2] At the time of W's first disposition, Victor Cullen only provided level B services; by the time W was adjudicated delinquent in the case before us, Victor Cullen offered both level B and level A facilities. In fact, Victor Cullen is the only level A facility for boys in Maryland. *See* http://www.oag.state.md.us/JJMU/reports/15_Quarter2.pdf; http://www.djs.maryland.gov/victor-cullen.asp.

2

threw the gun to the ground, and began to walk away. When questioned by the officers, W said the weapon was his, but "[he] wasn't going to do anything with it" and further stated that he had no knowledge of or involvement in the robbery. He was indicted as an adult, but his case was waived to the juvenile court. W again admitted to his actions, and again pled involved, this time to possession of a regulated firearm by a person under age 21. The court also found W in violation of his probation.

The court held a hearing[3] on October 20, 2014 to review W's detention status; W was present with his attorney. The judge told W's attorney to "let [W] know he may not be going home." W then interjected: "And I'm getting a lot better, out of the prison." The court turned its attention to the attorneys to schedule a hearing for the following month, then adjourned.

At an adjudicatory hearing on November 18, 2014, the court accepted W's plea of involved, and asked him to explain his actions:

| | |
|---|---|
| THE COURT: | Okay. Young man, why did you do this? |
| [W]: | It was an honest mistake, Your Honor. I really shouldn't have done this. |
| THE COURT: | Okay. So, why did you do this? |
| [W]: | There is no explanation for why I did it. |

---

[3] Many hearings were scheduled between May and October. Most of these were short hearings to address W's needs for the period between his arrest and DJS placement, such as establishing GPS monitoring, placing him in a community support program, and confirming his detention status. The rest of the hearings were postponed, bringing us to October 20.

THE COURT:      Okay.  So, why did you do it?

[W]:            I just—I made an honest mistake.  I tell you the reason why I did it would be an excuse . . . and there is no excuse for that.

THE COURT:      So, why did you do it?

[W]:            I was being a bonehead.

THE COURT:      Pardon me?

[W]:            I was being a knucklehead, thinking that I could get away with things I can't get away with.

THE COURT:      Well, so why did you do it?  You already had a robbery with a deadly weapon charge . . . .  Now you [have] possession of a gun.  Another one.

[THE STATE]:    There was not a gun in the prior—

[W]:            I understand, Sir.  I understand what I done.  I apologize for—

THE COURT:      No, I am just asking why did you do it.  Because you are going to – you went to a placement, didn't you?

[W]:            Yes, Sir.

THE COURT:      How can I release you back into the community?

                        *      *      *

THE COURT:      No, let me stop you.  I just asked— because if you don't change your lifestyle in what you are doing, you will end up

4

|     |     |
| --- | --- |
|     | dead out here. . . . Or you going to end up killing somebody. . . . [L]ast time I asked you the same thing, why you walking around with a ski mask in the middle of the summer . . . with a deadly weapon. I am just saying—you got to change. Would I give you a break and put you back in the community— |
| [W]: | If I could say one thing on my behalf is that this charge and that I went to [detention] and understand that I could have faced even wors[e] charges and time for it. |
|     | I['m] really mature, and my age and I know that it's time to stop playing games and do something with my life or I'm going to throw it away. And I really don't - - I'm not ready for my life - - I got dreams and goals and things that I need to do. And with the support from my family that - - I can't keep doing this. |

The judge then scheduled a December hearing with counsel and ordered W's detention in the interim.

W's disposition hearing—the purpose of which was to determine W's level of placement, *i.e.*, whether he should remain in a level B facility or move to level A—took place on December 11, 2014. After an inaudible bench conversation, the State and W's attorney agreed that W should maintain his level B placement, while DJS requested a level A commitment. The judge questioned W about the incident, again emphasizing the similarities between his two arrests:

THE COURT:        I am asking him a question because when is he going to learn his lesson.

[W]:              I mean I can't make you believe me but— I honestly feel like that the lesson I learned when I was up in [detention] facing that—

THE COURT:        Wait, whoa, whoa, wait, how long were you gone the other time?

                          *        *        *

[W]:              Eight months.

THE COURT:        And you didn't learn you lesson then?

[W]:              I did.  I just—I am telling you—I made a mistake, I—

THE COURT:        No, no, no.  It is not a mistake when you . . . put a gun in your hand.  That's not a mistake.

[W]:              It wasn't a mistake, it was more of a defense.  But I should have went about it differently than what I did.  And I can't really take it back now, I mean.

THE COURT:        So, what am I supposed to do with - - the mistakes that you keep making?

[W]:              I accept any consequences, Sir. (Inaudible) on behalf of the mistakes that I know that (Inaudible).

THE COURT:        You have any—the problem is you are putting yourself in harm's way.

[W]:              Exactly.

6

| THE COURT: | I am not asking for a response. I am just—this is ridiculous. |
|---|---|
| [W]: | I am ashamed of myself, too, Sir. |
| THE COURT: | Madam Clerk, the Court will in fact commit [W] to Level A. I agree, you got to stop this, young man. You are going to wind up getting yourself killed out here. |

* * *

And since he has already been at Victor [Cullen Center] he is not going back to Victor [Cullen Center].

* * *

| [THE STATE]: | Your Honor, can we have a review [hearing] for placement, it is just today— I am sorry, I just realized that— |
|---|---|
| THE COURT: | No problem. You got [January 13, 2015]. |

After the hearing, the court issued a written Disposition Order, dated December 11, 2015, which ordered that W "be and hereby is placed in **Level A** . . . ." The Order consisted of a template that stated the three classification levels for placement facilities—level A, B, and C—into which the judge inserted an additional limitation (which we have italicized):

A – Secured Facility – *[W] is not be placed at Victor Cullen because he was placed there in 2012.*
**Equivalent facilities for the juvenile are not available in the State of Maryland; and institutional care in the other jurisdiction is in the best interest of the juvenile and will not produce undue hardship.**

7

At the follow-up hearing on January 13, 2015, in a broken and mostly inaudible transcript, the court confirmed that DJS had not yet placed W, and the case was continued until January 20, 2015. On January 16, W filed a Motion to Modify Court Order and Request for a Hearing pursuant to Md. Rule 11-116, asking the court to strike the language italicized above from the Disposition Order. In this sixteen-page Motion, W asked the court to place him at the Victor Cullen Center, disputed the findings in the juvenile judge's Disposition Order, and asked to be heard regarding his placement. We will discuss the facts and arguments set forth in this Motion in greater detail in the Discussion.

At the January 20 hearing, counsel for W obtained a continuance to provide the juvenile judge an opportunity to review the January 16 motion. After agreeing on a hearing date, counsel for the State initiated another broken and inaudible—yet seemingly important—conversation regarding W's placement:

> [THE STATE]: Your Honor, may I ask a quick question. It is about, [W] is likely to be placed at Mid-Atlantic prior to that, would he need to appear for [the next] hearing or if he can—
>
> THE COURT: If he is placed, no.
>
> [THE STATE]: So, no.
>
> THE COURT: Counsel, would you approach?
>
> (Whereupon, a Bench Conference [begins].)
>
> THE COURT: Well, frankly I (Inaudible) placement. Anything?

8

MS.[4]:              (Inaudible)

THE COURT:          I know.

MS.:                (Inaudible)

THE COURT:          Yes.  I will probably rule on it some time
                    this week.

MS.:                Okay.

THE COURT:           Yes.  And that (Inaudible) do whatever
                    they want to do?

[THE STATE]:        (Inaudible)

THE COURT:          Okay.

[THE STATE]:        (Inaudible)

MS.:                (Inaudible)

THE COURT]:         No, (Inaudible).  Somebody, it looked like
                    it was filed late Friday, yes.  Okay.  Thank
                    you.
MS.:                (Inaudible)

THE COURT:          Yes.

(Whereupon, the Bench Conference was concluded.)

THE COURT:          I am going to have it sent to Chambers
                    today, [counsel].

---

[4] There is no name for the inaudible speaker in the transcript; it appears here just as it does in the record.  The only females present (according to the record) at this hearing were W's co-counsel.  Both of his attorneys spoke on the record and are referred to earlier in the transcript by name.  We suspect that one of W's attorneys was inquiring as to the status of his Motion to Modify Court Order and Request for a Hearing, which was filed on a Friday.

[COUNSEL FOR W]:      Thank you.

(Whereupon, the hearing was concluded.)

At the conclusion of this January 20 hearing: (1) W had yet to be placed; (2) the juvenile judge had not reviewed W's Motion, nor addressed the requested hearing; (3) the parties agreed to return on February 2, 2015; and (4) the State indicated that W would be placed prior to the hearing.

On January 28, 2015, W was placed by DJS at the Mid-Atlantic Youth Service's Secure Male Program ("MAYS") in Pittston Township, Pennsylvania. Two days later, the juvenile judge ruled on W's Motion to Modify Court Order and Request for a Hearing. When W filed the Motion on January 16, he had included a proposed order; the judge used the proposed order as a template, but modified it by crossing out portions shown below in a blue pen:

> Having reviewed Respondent's Motion to Modify Court Order and Request For A Hearing and that Motion having merit, Respondent's Motion is hereby GRANTED. The following language shall be stricken from this Court's [Disposition Order]: "Respondent not to be placed in Victor Cullen."
>
> ~~AND~~
>
> The following language shall be stricken from this Court's [Disposition Order]: "Equival~~~~ ~~~~for the juvenile are not available in the State of Maryland; and institutional care in

10

other jurisdiction is in the best interest of the juvenile and will

not produce undue hardship."

**OR**

A hearing on ~~Respondent's Motion~~ shall occur at 9:00 in the

morning on the ___ day of _____, 201__.

The court signed the area indicated by the gray circle and at the bottom of the page, then

dated the order January 30, 2015; it was entered on the docket on February 5, 2015.

As directed, the parties reconvened on February 2. By this point, W was in

Pennsylvania, but his counsel was present. After the State disclosed that W had been

placed at MAYS, the court reset the case for October 15, 2015 for a permanency hearing.

W filed a timely notice of appeal.[5] Then, on October 7, 2015, the court rescinded the

December 11, 2014 commitment order and placed W on probation, with conditions, and

ordered him released on electronic monitoring.

## II. DISCUSSION

W does not dispute the finding of delinquency. Instead, he challenges his out-of-

state placement, and specifically whether the disposition proceedings complied with FL

---

[5] In his Notice of Appeal, W refers to the January 30 Order as granting in part and denying in part the January 16 Motion. In his brief, W interprets the blue pen marks as denying his requests to strike the language regarding the availability of equivalent facilities in Maryland and to schedule a hearing, but granting his first request, *i.e.*, to strike the limitation on placement at the Victor Cullen Center. W takes the position that the partial denial creates a final, appealable order, and the State does not contest this interpretation.

§ 5-607 and afforded him due process before the court placed him out of state.[6]  *First*, W argues that he was denied due process because the court failed to notify him or his parents that it was contemplating an out-of-state placement, and thus denied him and his parents a meaningful opportunity to be heard on whether the contemplated placement was in his best interest or would pose an undue hardship on his family.  *Second*, W claims that the juvenile court ignored the requirements of FL § 5-607 when it did not hear evidence or consider any facts before concluding that there was no equivalent facility in Maryland, that the MAYS placement was in his best interest, and that sending him to MAYS would not cause any undue hardship for his family.

In reviewing the circuit court's decision in a juvenile delinquency matter, "[w]e review any conclusions of law *de novo*, but apply the clearly erroneous standard to findings of fact."  *In re Elrich S.*, 416 Md. 15, 30 (2010).  A decision regarding disposition is

_____

[6] W phrased his Questions Presented as follows:

> 1. Did the juvenile court violate Family Law Article § 5-607 and due process of law by failing to notify [W.Y.] and his parents that it was considering authorizing out-of-state placement and to give them a meaningful opportunity to be heard before finding in its December 11, 2014 disposition order that "[e]quivalent facilities for the juvenile are not available in the State of Maryland; and institutional care in the other jurisdiction is in the best interest of the juvenile and will not produce undue hardship"?

> 2. Were the juvenile court's findings regarding out-of-state placement premature, unsupported by the record, and clearly erroneous?

committed to the discretion of the trial judge and will be reversed only if there has been an abuse of discretion. *In re Hamill*, 10 Md. App. 586, 592 (1970). An abuse of discretion occurs "'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Pickett v. State*, 222 Md. App. 322, 331 (2015) (quoting *Nash v. State*, 439 Md. 53, 67 (2014)).

### A.    This Appeal Is Moot.

Initially, though, we have to confront the ongoing justiciability of the case in light of the fact that the order from which W appeals is no longer in force. The State filed its brief in this Court on October 13, 2015, six days after the circuit court rescinded the commitment order, and argues that this development mooted W's appeal. W acknowledges that the appeal is moot, but urges us to "address the merits of the issues raised because they are unresolved issues of important public concern on which guidance would be helpful," and because the error he asserts "is not merely capable of repetition; it has been repeated in numerous cases."

Courts decide live disputes, and we normally should decline to address the merits of a moot case. *Lloyd v. Bd. of Sup'rs of Elections of Balt. Cty.*, 206 Md. 36, 41 (1954) (citations omitted). "A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn*, 342 Md. 244, 250 (1996). And that is the case here: the juvenile court's partial denial of W's motion to modify that Order was effectively granted at the time of rescission, so there is no relief for us to grant him.

13

In rare instances, however, courts can decide to address the merits of a moot case when the issues concern matters of great importance, the public interest will be affected, or there is a likelihood that the wrongdoing will soon be repeated if not immediately resolved. *Lloyd*, 206 Md. at 42-43 (requiring a "concurrence in sufficient weight of the[se] factors which together add up to the exception"). And this is such a case.

*First*, this case raises matters of great public importance. "This Court . . . may address the merits of a moot case if we are convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct." *Coburn*, 342 Md. at 250 (citing *State v. Peterson*, 315 Md. 73, 82-83 (1989)). Section 5-607 involves critical due process and liberty interests for juvenile defendants and their families. Although the language of FL § 5-607 seems straightforward, no Maryland appellate court has interpreted or applied it. And the allegations underlying this case—that the mandatory findings required by FL § 5-607 are being inserted *verbatim* into form orders and juveniles placed out-of-state without the required findings—are serious. W argues that "the effect of these boilerplate findings is that they pave the way for DJS to place a child out-of-state, even though the issue was never raised in the hearing." If true, such a practice raises due process concerns that deserve appellate attention.

*Second*, this issue is likely to recur, but will escape appellate review due to the limited duration of most juvenile commitments and the continuing jurisdiction of the juvenile court to modify or rescind commitment orders. Secure residential treatment programs, including the programs at Victor Cullen Center and MAYS, typically last six to

14

nine months. *See* DJS: VICTOR CULLEN CENTER, www.djs.maryland.gov/victor-cullen.asp; MAYS: SECURE RESIDENTIAL TREATMENT, www.midatlanticyouth.com/programs/residential.shtml. We agree with W that "[b]etween the time it takes for the record to be compiled and transmitted, the time involved in briefing and argument, and the time necessary for the Court to generate its opinion and mandate, the appellate process will often last longer than the juvenile commitment." We have, in fact, seen this issue present itself repeatedly in recent months, and we are persuaded it is worthy of a reported appellate opinion.[7]

## B. The Juvenile Court Abused Its Discretion By Limiting The Commitment Beyond The *Type* Of Facility.

W does not challenge his level A placement, a decision grounded in and supported by the evidence and testimony the court considered during the December 11, 2014 hearing. Both W and the State accepted a level B commitment, but DJS pressed for a level A commitment, not least because W had previously completed a level B commitment at Victor Cullen for eight months. The court gave W an opportunity to speak about the incident underlying these charges and his prior commitment, and concluded that W had

---

[7] At the time the briefs were filed, at least three other such cases were pending in this Court: *In re Alante B.*, Sept. Term 2014, No. 2724 (decided December 15, 2015); *In re James W.*, Sept. Term 2014, No. 1278 (disposition pending as of this publication); *In re Malik L.*, Sept. Term 2014, No. 1500 (decided September 1, 2015); *In re Shane M.*, Sept. Term 2014, No. 2414 (decided September 2, 2015).

been insufficiently rehabilitated after eight months in a level B commitment at Victor Cullen and should be sent to a level A facility.

That's fine as far as it went. But accompanying the level A indication on the Disposition Order was a direction that W was "not to be placed at Victor Cullen because he was placed there in 2012." Relying on *In re Demetrius J.*, 321 Md. 468 (1991), W argues that the juvenile court "exceeded its authority and interfered with a prerogative of DJS when it prohibited placing [him] at the Victor Cullen facility." The State does not address this contention. We agree with W that the juvenile court abused its discretion by limiting the commitment beyond the type of facility.

Pursuant to the Juvenile Cases subtitle of the Courts and Judicial Proceedings Article ("CJP"), a juvenile court may place a child on probation, under supervision in his own home, or in custody or care outside of his home "upon terms the court deems appropriate . . . ." Md. Code (1974, 2013 Repl. Vol., 2015 Supp.), § 3-8A-19(d)(1)(i) of the CJP Article. If committing the child to custody or guardianship outside of his own home, the court may assign the child to DJS, the Department of Health and Mental Hygiene ("DHMH"), or an agency "to meet the priorities set forth in CJP § 3-8A-02[8] of this

---

[8] These priorities are set forth in CJP § 3-8A-02:

> (a) The purposes of this subtitle are:
>     (1)    To ensure that the Juvenile Justice System balances the following objectives for children who have committed delinquent acts:

subtitle, including designation of the type of facility[9] where the child is to be accommodated . . . ." *Id.*, (d)(1)(ii). But the precise scope of the juvenile court's authority under this subtitle has received little appellate attention.

---

> (i) Public safety and the protection of the community;
> (ii) Accountability of the child to the victim and the community for offenses committed; and
> (iii) Competency and character development to assist children in becoming responsible and productive members of society;
>
> (2) To hold parents of children found to be delinquent responsible for the child's behavior and accountable to the victim and the community;
>
> (3) To hold parents of children found to be delinquent or in need of supervision responsible, where possible, for remedying the circumstances that required the court's intervention;
>
> (4) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;
>
> (5) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;
>
> (6) If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents;
>
> (7) To provide to children in State care and custody:
> (i) A safe, humane, and caring environment; and
> (ii) Access to required services; and
>
> (8) To provide judicial procedures for carrying out the provisions of this subtitle.

[9] The "type of facility" refers to its level of security. Although the labels vary by county (*e.g.*, levels I, II, II or levels A, B, C), DJS defines hardware-secure, staff-secure, and community detention as the three most restrictive types of out-of-home commitments:

17

In the consolidated appeal of *In re Demetrius J.*, 321 Md. 468 (1991), a juvenile

court committed three delinquent juveniles to DJS, and further directed that they be placed

at a specific private Pennsylvania facility. At the bottom of each disposition order was a

handwritten command: "Respondent to be placed at the Glen Mills School." *Id.* at 477. In

the lead case, the court was expressly aware that it did not have the authority to direct

> **Hardware Secure Facility:** A facility that relies primarily on the use of construction and hardware such as locks, bars, and fences to restrict freedom.
>
> **Staff Secure Facility:** Programs where a youth's movement is controlled by staff supervision rather than by restrictive architectural features.
>
> **Community Detention (CD):** The supervision and guidance of juveniles under court ordered placement to the DJS Community Detention Program. DJS ensures youth compliance with the terms and conditions of community detention through supervision, field visits, surveillance, and electronic monitoring.

The State has at least one facility available within each classification type. For example, Victor Cullen Center is the only state-operated hardware-secure facility for males. Males sent to hardware-secure facilities are usually repeat and/or violent offenders. There are at least five State-operated staff-secure facilities that house non-violent or non-chronic offenders. Secure facilities also feature addiction programs, behavioral programs, and group homes with schools on-site. Community detention encompasses many less restrictive community-based placements, including foster care, group homes, and independent living programs. DJS: RESIDENTIAL AND COMMUNITY-BASED SERVICES GAP ANALYSIS, http://www.djs.state.md.us/docs/2013_GAP%20analysis.pdf; DJS: DATA RESOURCE GUIDE FY 2012, http://www.djs.maryland.gov/drg/DRG_2012_Whole_book_with_Pullouts_updated_reci divism_data.pdf.

placement in a specific facility. *Id.* at 480. Nevertheless, the court reasoned that it was not actually directing DJS to place the juveniles in that particular facility, but rather named that facility as an *example* of the "type of facility" where DJS was to place the juvenile:

> [I]t's always been my understanding as a juvenile judge and as the administrative judge of this court that I had the authority to designate the type of institution that a juvenile was to be committed to and the statute confirmed that and that's all I have done here. By using the key words, Glen Mills, I have designated a bundle of characteristics of an institution, which I felt, after everyone agreed, had the appropriate characteristics for Demetrius, for his well-being, his best interest, for society's best interest, for Juvenile Services' best interest.

*Id.*

DJS noted that "[t]he court, however, neither described nor made any findings of fact as to this 'bundle of characteristics.'" *Id.* And after analyzing the text of the statute and the legislative intent, the Court of Appeals concluded that the juvenile court lacked authority to order placement of a committed child at a specific facility:

> The question concerning the authority to designate a specific facility resulted in a compromise reflected in the present statute. The statute, as we have seen, permits the court to name the type of facility but generally bestows no authority on the court to specify a particular facility. The compromise was encouraged in significant part by the hope that it would avoid [separation of powers] considerations.

*Id.* at 476. Accordingly, the Court reversed the trial court's order. *Id.* at 481. *Cf. In re Appeal No. 653*, 277 Md. 212, 219 (1976), *superseded by statute*, CJP 3-8A-19, *as recognized in* Demetrius, 321 Md. at 476 (affirming a juvenile court's commitment to DHMH but reversing the court's command to place the child in a treatment facility

"separate from adult patients" because mandating separation was the prerogative of DHMH); *In re George G.*, 64 Md. App. 70, 81-82 (1985) (reversing a disposition order that sentenced the juvenile to a "court-controlled commitment" and further specified that the child was not to receive leave of any kind for six months); *Md. DHMH v. Prince George's Cty. DSS*, 47 Md. App. 436, 445 (1980) (reversing juvenile court's order that DHMH pay the cost of a child's placement, stating that our disposition statute "empowers the court to commit a child to the custody of DHMH; it does not confer upon the court any right to mandate the specific terms of the commitment").[10]

This separation of powers concern re-emerges in a later provision of the Juvenile Cases subtitle that addresses the transfer of juveniles already committed to DJS:

> (1)    When necessary to appropriately administer the commitment of the child, the [DJS], on approval of the Director of Behavioral Health, may transfer a child committed for residential placement from one facility to another facility that is operated, licensed, or contracted by [DJS].
>
> (2)    A facility to which a child is transferred under paragraph (1) of this subsection shall be:
>
>     (i)    Consistent with the type of facility designated by the court under subsection (d)(1)(ii) of this section; or
>
>     (ii)    More secure than the type of facility designated by the court under subsection (d)(1)(ii) of this section.

---

[10] These three latter cases spurred passage of CJP § 3-8A-19, the current disposition statute. *See Demetrius*, 321 Md. at 476.

20

CJP § 3-8A-19(l)(1)-(2). Again, DJS controls the specific placement of delinquent juveniles and the constraints on the court's authority: the court may designate the type of facility, but DJS handles the details. And once the court designates the type of facility, that disposition serves as a starting point, or floor, from which DJS assumes monitoring and control—DJS can, by statutory design, increase the restrictiveness of the child's placement without consulting the court.

*Demetrius* compels the conclusion that the juvenile court abused its discretion when it ordered that "[W] is not to be placed at Victor Cullen because he was placed there in 2012." We see no principled distinction between a court that designates a particular facility—*e.g.*, ordering a juvenile to Glen Mills School—and a court that excludes a particular facility—*e.g.*, precluding a juvenile from going to Victor Cullen Center. As the Court of Appeals held in *Demetrius* and we restated in *In re Julianna B.*, juvenile courts may only designate the type of facility; the specific assignment within that type remains the prerogative of DJS. 179 Md. App. 512, 562 (2008), *vacated as moot*, 407 Md. 657 (2009) (citing *Demetrius*, 321 Md. at 475-76) (explaining that the General Assembly intended that the particular facility in which a delinquent child may be placed is within the exclusive discretion of DJS). The court was well within its authority to commit W to a level A, or hardware-secure, placement, but exceeded its statutory authority in excluding him from the Victor Cullen Center. The court is, of course, free to offer recommendations, and the suggestion that W would be better off not returning to the site of his last placement

21

could be a sensible one. But the statute gives DJS, not the court, the ultimate authority to place the child so long as the facility was of the same (or more restrictive) type of placement as the judge ordered.

### C. The Disposition Proceedings And Order Did Not Comply With FL § 5-607.

FL § 5-607 is part of the Interstate Compact on the Placement of Children ("ICPC"), which was enacted in Maryland by Chapter 266 of the Acts of 1975 and is codified now in Md. Code (1984, 2012 Repl. Vol.), §§ 5-601 to 5-611 of the Family Law Article ("FL").[11] The ICPC is a platform for "the party states to cooperate with each other in the interstate placement of children," such that:

> (1) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.
>
> (2) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.
>
> (3) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

---

[11] All fifty states, the District of Columbia, and the U.S. Virgin Islands have enacted the ICPC. *See* AMERICAN PUBLIC HUMAN SERVICES ASSOCIATION, Association of Administrators of the ICPC, http://icpc.aphsa.org/content/AAICPC/en/about.html (last visited May 17, 2016).

FL § 5-602. The juvenile court's authority to place delinquent children outside of Maryland arises from FL § 5-601(7): "Any court having jurisdiction to place delinquent children may place such a child in an institution of or in another state pursuant to § 5-607 of the [ICPC]." And FL § 5-607 defines the procedural safeguards and factual findings that must be satisfied before ordering such a placement. These lie at the substantive heart of this case.

FL § 5-607 contains a notice requirement and a findings requirement, discrete prerequisites separated by the conjunctive "and":

> A child adjudicated delinquent may be placed in an institution in another party jurisdiction pursuant to [the ICPC] but *no such placement shall be made unless the child is given a court hearing on notice to the parent or guardian with opportunity to be heard, prior to the child being sent to such other party jurisdiction for institutional care* **and** the court finds that:
>
> (1) equivalent facilities for the child are not available in the sending agency's jurisdiction; and
>
> (2) institutional care in the other jurisdiction is in the best interest of the child and will not produce undue hardship.

(Emphases added.)

We review a court's factual findings as to the § 5-607 factors for clear error, *In re Shirley B.*, 419 Md. at 11, 18 (2011), and "if there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous." *Cannon v. Cannon*, 156 Md. App. 387, 404 (2004) (internal citations and quotations

23

omitted), *aff'd* 384 Md. 537 (2005).  W argues that the juvenile court failed to comply both with the notice and the findings requirements, and we agree.

The requirement that the juvenile and his parent must have notice *and* an opportunity to be heard is rooted in the principle that out-of-state placements of delinquent children "are similar to probation or parole supervision," and thus a restriction on liberty that cannot be imposed without due process.  *Sinhogar v. Parry*, 412 N.Y.S.2d 966, 973 (N.Y. Sup. Ct. 1979) (in decisions separating the parent and child, "there is a legally recognizable interest to which the due process requirement of the Constitution attaches").  The State maintains that "[W] and his counsel and family were apprised . . . of the time of his various adjudicatory, disposition and review hearings," and that they "had an opportunity to appear and be heard" at each of his proceedings.  The State also refers to the (mostly inaudible) bench conference at the January 20 hearing, and contends that no one opposed W's potential commitment to MAYS.  But the record contains no evidence that W or his family were notified of the potential out-of-state placement in advance of the hearing, and the State cites no authority for the proposition that being told *at the hearing* satisfies due process.

At the December 11, 2014 disposition hearing, the judge discussed with W the reasons for his delinquent actions and asked whether he had learned his lesson.  But that was the extent of W's communication with the court regarding his disposition.  After hearing from W, the judge ordered level A placement and announced that Victor Cullen could not be an option, after which the State requested a subsequent hearing to discuss W's

24

placement. The court set the review hearing for January 13, but that was continued to January 20, and then that hearing was postponed to February 2, by which time W was at MAYS. This left no opportunity for W or his family to be heard on this issue before the placement occurred.

Although the judge stated in open court during the December 11 hearing that W was committed to a level A placement other than Victor Cullen, this declaration could not serve as notice to W and his family because that information doesn't mean to them what it does to the court: W's family can't be charged with knowing that the only in-state level A facility is Victor Cullen. And nothing in the record prior to the December 11 hearing put W or his family on notice that W might be sent to another state—to the contrary, at his November 18, 2014 adjudication hearing, W signed an "Admission (Plea) Under Rule 11-107" agreement, which stated, "I fully understand that the worst the Court can do to me is send me to a State juvenile institution until I turn 21." Merely apprising the family of the hearing dates does not provide notice of the possibility that a juvenile faces an out-of-state placement, nor does it afford the juvenile or his family an opportunity to be heard. *See Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 313 (1950) (due process requires adjudication "preceded by notice and opportunity for hearing appropriate to the nature of the case"). The record in this case reflects that neither W nor his family was given an opportunity to address his exclusion from Victor Cullen or the appropriateness of the intended out-of-state placement because he was placed at MAYS before the scheduled hearing, and this lack of notice failed to comply with FL § 5-607.

25

From there, the commitment decision itself suffers from a lack of evidence bearing on the issues one way or the other. The commitment hearing addressed only W's delinquent act, and the commitment order consists of a form list that includes the statutory language for Type A, B, and C commitments and inserts only language designating Level A. The record contains nothing relating to the presence or absence of equivalent facilities, W's best interests, or the potential hardship to him or his family from an out-of-state placement.

We are not saying that an out-of-state placement in this case was *per se* improper, nor are we saying that Victor Cullen Center *was* the best placement for W, nor are we saying that MAYS was an *in*appropriate placement—the record contains no facts or testimony to support any of these possible conclusions. Nor are we saying that courts cannot use form orders to streamline the process of documenting its decisions. We *are* saying, however, that a juvenile court must establish an affirmative factual record that supports the FL § 5-607 findings that justify an out-of-state placement for the particular juvenile, *and* that the court's order, however generated, must reflect those findings.

**APPEAL DISMISSED. COSTS TO BE PAID BY APPELLEE.**

26