*Joseph Isaac Rohrbaugh v. State of Maryland*, No. 2009, September Term, 2021. Opinion by Sharer, J. Frederick.

**INFANTS – RIGHTS AND PRIVILEGES AS TO ADULT PROSECUTIONS – JUVENILE TRANSFERS AND CERTIFICATIONS – TRANSFER FROM ADULT COURT**

In a "reverse waiver" hearing, where a juvenile defendant was seeking a transfer of criminal charges from the circuit court to the juvenile court, the circuit court did not err in placing the burden of persuasion on the juvenile to show that a transfer of the criminal court's jurisdiction was in the interest of the child or society. That decision was consistent with the relevant case law and § 4-202 of the Criminal Procedure Article of the Maryland Code, which governs reverse waiver proceedings. The decision was also consistent with the general policy that the moving party, in this case the juvenile, bears the burden of proof where, as in this case, the party is asserting the affirmative of an issue or seeking to change the status quo. Finally, the court's decision did not violate the juvenile's due process rights given that: there is no constitutional right to be treated as a juvenile; a reverse waiver hearing is a civil matter; and the relevant proceedings are replete with due process protections.

**INFANTS – RIGHTS AND PRIVILEGES AS TO ADULT PROSECUTIONS – APPEAL AND REVIEW – DISCRETION OF LOWER COURT – JUVENILE TRANSFERS AND CERTIFICATIONS**

Circuit court did not abuse its discretion in denying juvenile's reverse waiver motion. Record showed that the court considered, in detail, all of the requisite statutory factors before making its decision. In so doing, the court properly focused on the juvenile's amenability to treatment in the juvenile system and found that there were no programs in the juvenile system that could address the issues defined or produce a better result than anything in the adult system.

Circuit Court for Harford County
Case No. C-12-CR-21-000892

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 2009

September Term, 2021

_____

JOSEPH ISAAC ROHRBAUGH

v.

STATE OF MARYLAND

_____

Zic,
Tang,
Sharer, J. Frederick
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Sharer, J.

_____

Filed: March 31, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

Joseph Rohrbaugh, a minor, was charged, in the Circuit Court for Harford County, as an adult in two cases following two separate incidents involving a firearm. Mr. Rohrbaugh thereafter filed a motion to have the cases transferred to the juvenile court. Following a hearing, the circuit court denied the motion. Mr. Rohrbaugh then waived his right to a jury trial and proceeded to a bench trial, where he pleaded not guilty pursuant to an agreed statement of facts. After the State dismissed all but one of the charges, the court found Mr. Rohrbaugh guilty of the remaining charge – possession of a regulated firearm by a person under the age of twenty-one. The court sentenced Mr. Rohrbaugh to a term of five years' imprisonment, suspended all but time served, and imposed a four-year period of probation. In this appeal, Mr. Rohrbaugh presents two questions for our review:

1. Did the circuit court err in placing the burden of proof on Mr. Rohrbaugh to show that a transfer to the juvenile court was appropriate?

2. Did the circuit court err in denying Mr. Rohrbaugh's motion to have his cases transferred to the juvenile court?

For reasons to follow, we hold that that circuit court did not err in placing the burden of proof on Mr. Rohrbaugh or in denying his transfer motion. Accordingly, we affirm.

## BACKGROUND

Joseph Rohrbaugh, then 16 years old, was charged as an adult in two separate cases in the circuit court. In the first case (C-12-CR-21-000879), Mr. Rohrbaugh was charged with first-degree assault, second-degree assault, possession of a firearm, and related offenses. Those charges stemmed from an incident that occurred in August 2021 in which Mr. Rohrbaugh allegedly discharged a firearm during a large fight between two groups of

females. In the second case (C-12-CR-21-000892), Mr. Rohrbaugh was charged with possession of a loaded firearm and related offenses. Those charges stemmed from an incident that occurred in September 2021 in which Mr. Rohrbaugh was allegedly found in possession of a firearm.

Although, ordinarily, the juvenile court, and not the circuit court, would have exclusive jurisdiction over a child such as Mr. Rohrbaugh who was alleged to have committed a crime, § 3-8A-03 of the Courts and Judicial Proceedings ("CJP") Article of the Maryland Code provides that the juvenile court does not have jurisdiction when the minor is at least 16 years old and is alleged to have committed certain enumerated crimes. CJP § 3-8A-03. It is undisputed that the charged crimes in both of Mr. Rohrbaugh's cases were properly brought in the circuit court.

After being charged, Mr. Rohrbaugh filed a motion to have his cases transferred to the juvenile court pursuant to Maryland Code, § 4-202 of the Criminal Procedure ("CP") Article. Under that statute, the circuit court may transfer a case involving a child to the juvenile court if, among other things, "the court determines by a preponderance of the evidence that a transfer of its jurisdiction is in the interest of the child or society."[1] CP § 4-202(b)(3). In making that determination, the court is required to consider: "(1) the age of the child; (2) the mental and physical condition of the child; (3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children; (4) the nature of the alleged crime; and (5) the public safety." CP § 4-202(d).

---

[1] The statute includes additional criteria not germane to the instant appeal. CP § 4-202(b).

2

In conjunction with his transfer motion, Mr. Rohrbaugh also filed a motion asking the circuit court to place the burden of proof on the State. Mr. Rohrbaugh argued that, because CP § 4-202 was "vague" as to who has the burden when a transfer motion has been filed, the State should be required "to prove by a preponderance of the evidence that Mr. Rohrbaugh is not amenable to treatment in the juvenile system." The State opposed the motion, arguing that the moving party should bear the burden of proof.

### *Hearing*

A hearing on Mr. Rohrbaugh's motions was held in February 2022, at which the circuit court first addressed Mr. Rohrbaugh's motion regarding the burden of proof. The court ultimately denied the motion, finding that the language of the statute and the relevant caselaw supported the State's position that Mr. Rohrbaugh, as the moving party, should carry the burden.

The circuit court then took up Mr. Rohrbaugh's transfer motion. That evidence included testimony from the following witnesses: DuWonda James, a case manager with the Maryland Department of Juvenile Services ("DJS"); Keegan Wilson, a social worker with the Maryland Office of the Public Defender ("OPD"); and Fontaine Ewell, a clinical psychologist. The evidence also included the following reports: a "Transfer/Waiver Report" prepared by DJS; a "Transfer/Waiver Assessment Staffing Team Meeting Outcome Report" prepared by DJS; a "Transfer/Waiver Psychological Assessment Report" prepared by Jikesha Benton-Johnson, a clinical psychologist; a "Psychosocial Assessment" prepared by OPD; and a "Psychological Evaluation" prepared by Fontaine Ewell.

3

Mr. Rohrbaugh was born on January 25, 2005, thus he was approximately 16 years and nine months of age when the charged crimes were allegedly committed; he had just turned 17 years old when the transfer hearing was held. At the time, Mr. Rohrbaugh was attending the Charles H. Hickey School, but he was receiving average to poor grades. Mr. Rohrbaugh had been participating in virtual learning at a local high school, where he did not complete any work and subsequently earned failing marks in all his classes. Mr. Rohrbaugh reported that he had been suspended from school for fighting on more than one occasion.

Mr. Rohrbaugh was 5'8" tall and weighed approximately 120 pounds. He was diagnosed as suffering from various disorders, including anxiety, depression, and unspecified trauma and stress-related issues. Prior to the incidents in question, Mr. Rohrbaugh experienced a series of traumatic events. When Mr. Rohrbaugh was in the fourth grade, a counselor with whom he had a close relationship died of cancer. Mr. Rohrbaugh also had an older sister and an older brother who were murdered. When he was ten years old, Mr. Rohrbaugh learned that the man with whom he and his mother were living was not his biological father and that his actual biological father had not been in his life because he had been incarcerated. Mr. Rohrbaugh's mother later rekindled her relationship with Mr. Rohrbaugh's biological father, and the three began living together. When Mr. Rohrbaugh was in sixth grade, he and his family were the victims of an armed home invasion. On another occasion, Mr. Rohrbaugh was at home when the police executed a search warrant of the home and discovered a gun.

4

Mr. Rohrbaugh had prior involvement in the juvenile justice system. In 2019, at the age of 14, Mr. Rohrbaugh was allegedly involved in an armed robbery, which resulted in a disposition of probation. In 2020, Mr. Rohrbaugh was allegedly involved in another armed robbery and was subsequently detained and then released on home detention. Mr. Rohrbaugh thereafter completed a victim awareness program, 100 hours of community service, and several months of family therapy. The family therapy ended when Mr. Rohrbaugh was arrested following the September 2021 incident in which he was allegedly found in possession of a firearm. That arrest occurred pursuant to an arrest warrant that had been issued for Mr. Rohrbaugh based on the August 2021 incident in which he allegedly fired a gun during a brawl involving two large groups of females. The August 2021 and September 2021 incidents resulted in the charges for which Mr. Rohrbaugh was seeking a transfer to the juvenile court.

Regarding potential dispositions in the current case, DJS recommended that Mr. Rohrbaugh be placed in one of several DJS-operated facilities that had a "staff secure" level of care. DJS recommended that Mr. Rohrbaugh be provided individual therapy, peer group activities, structured academic support, and vocational training, all of which he could receive through the juvenile system. DJS noted that Mr. Rohrbaugh would be eligible for such services until he turned 21 years old, although placement would become more difficult as he neared that age.

OPD agreed with DJS's recommendations and found that DJS could appropriately address Mr. Rohrbaugh's behavioral, mental health, and educational needs through its community based and residential services. OPD contended that DJS could provide Mr.

Rohrbaugh with the motivation to be successful and would ensure that Mr. Rohrbaugh be held accountable to his responsibilities. OPD noted that Mr. Rohrbaugh's "brain is still developing and learning to navigate the world" and that such development continues until age 24.

Dr. Benton-Johnson identified Mr. Rohrbaugh as a "moderate risk for future violence" and highlighted several areas requiring intervention: "risk-taking/impulsivity, peer delinquency, and history of fighting in school." Dr. Benton-Johnson opined that Mr. Rohrbaugh would benefit from individual therapy, structured peer group activities, and mentoring services to address his decision-making and impulse control, to enhance his social skills and self-regulation, and to address his compliance behavior and coping skills.

Dr. Ewell found that Mr. Rohrbaugh's trauma-related disorder had not been fully identified or treated. He noted that DJS had "many treatment programs" available to individuals such as Mr. Rohrbaugh and that Mr. Rohrbaugh would benefit from those programs. Dr. Ewell explained that the "adult system" would not provide those same benefits and could, in fact, cause Mr. Rohrbaugh to "develop more antisocial tendencies." Dr. Ewell found that Mr. Rohrbaugh was "amenable to treatment" because he "attaches well to others and has the ability to form a productive, therapeutic alliance with others."

### Circuit Court's Findings and Ruling

At the conclusion of the hearing, the circuit court made express findings as to each of the five factors outlined in CP § 4-202. As to the first factor, the age of the child, the court found:

6

He is seventeen years old. Certainly he is young enough to be placed into the juvenile system. However, I also note it is under four years left to monitor him to the age of twenty-one and we have an awful lot of therapy that has been recommended.

* * *

As to his age in the juvenile system, we have less than four years left, if they even have that. The question is how long would he be kept at the Youth Centers or Cullen Academy for secure treatment. Even if they have him for four years in the adult system, we have jurisdiction in the adult system for longer. That would be for the length of his sentence plus five years of probation where he can do all of the programs and counseling, et cetera.

As to the second factor, the mental and physical condition of the child, the circuit court found:

He is 5 foot 8 inches, 120 pounds. He is of slight build. He certainly appears to be tall enough. He has been described as being one of the smaller ones, if not the small one among his friends and cohorts, et cetera.

On the mental side, we do have a few things. We have depression. We have anger that relates to some familial issues about the man that he thought was his father and then it turns out wasn't his father and then his real father was out of his life for ten years and now is back in and certainly that is going to create issues. We also have the trauma related disorder and he has had that. Not only the issues with his father and the man that he thought was his father, we have had him witness and be a victim in a home invasion, two siblings have been killed and a teacher … he was close to and then came down with cancer. We have the adjustment disorder unspecified and they relate that to isolated symptoms of anxiety and depression. Of course, that could be related to all of these things in the past, but it could also be related to his continuing legal problems.

As was argued, trauma has a significant impact on juveniles as the brain is still developing. I think the argument was it is still developing up to the age of twenty-four, which I'll point out I don't know if that helps him or hurts him because that places him three years beyond juvenile jurisdiction.

7

As to the third factor, the amenability of the child to treatment in an institution, facility, or program available to delinquent children, the circuit court found:

> We have had two prior suspended commitments to the DJS that were run apparently concurrently. He did the Victim Awareness Program. He was doing therapy for a number of months, about approximately four months until he was detained on these new charges.
>
> The testimony from the psychologist is an important factor as to amenability is [sic] the individual's ability to make a connection with the counselor and she indicated that he has that ability. In fact, he had done that with the counselor that he had at that time. And yet, despite that, he re-offends not once, but twice. It is while he is doing that therapy.
>
> He did do the 100 hours of Community Work Service and he did the Victim Awareness Program. He was doing the counseling and he was cooperative with performing these assessments. Obviously that is in his own best interest. Once again, he continues to re-offend not once, but twice and in a major way with a gun.
>
> * * *
>
> As to the amenability to treatment, these are all offenses that occurred while under the supervision of DJS and [were] done while he was getting counseling. While he did two of the programs, how amendable to treatment is he really when he continues to re-offend with a gun not once, but twice?
>
> The psychologist once again had said a big factor to consider as to amenability is connection with a therapist. Well, he had that here and checking off some boxes and doing things is not the same as being amenable to treatment. We're looking for success and we certainly don't have that here.
>
> There has been a two year involvement between [Mr. Rohrbaugh] and DJS and there has been no improvement. In fact, the same dangerous behavior or worse with the actual shooting of a gun over a crowd of people. There has been no improvement in this two to three years with the involvement of DJS. So, this Court [sees] this as a long term journey for [Mr. Rohrbaugh], much longer than the juvenile system has even theoretically to the age of twenty-one.

There is certainly convincing evidence that they can place him now, but will his anger and trauma related disorder be fixed in the six to nine months or the nine to twelve months? The testimony was that once you get up into those areas, the older you get the harder it is to place. So, if this does take a period of time we're putting him up in that range.

There are programs in the Division of Corrections for youthful offenders and so he would have the time while [he] is in a secure facility, … and then we would have five full years available for probation upon release where service and supervision can continue. So, the adult system would have the resources to benefit [Mr. Rohrbaugh] and also protect society.

I'm sure it is in [Mr. Rohrbaugh's] wishes to have smaller consequences in the limited juvenile world, but that is not necessarily in his interest. As [the State] argued, if he is discharged from supervision too early before he gets a handle on all of these issues it certainly is not in his best interest, certainly not in the interest of society.

As to the fourth factor, the nature of the alleged crimes, the circuit court found:

We have the August 16th, 2021 incident where he allegedly shot a bullet over a crowd of people. At one place it said eighteen people and another place it said thirty. Either way, it is a large crowd of women having their own fight and he shoots a bullet over their head. One girl reported to be two feet in front of him and the gun is pointed just one foot over her[] and then the bullet is fired. This was apparently a gang fight of two groups of girls. So, that is obviously a concern, the nature of the current offense.

As to the fifth factor, the public safety, the circuit court found:

The Transfer/Waiver Psychological Assessment rates him a moderate risk for future violence without the services that they recommend. That's concerning enough, but his record and behavior speaks louder. We have an armed robbery in 2019, an armed robbery in 2020, and he has been suspended from school on at least two occasions for fighting. So, one has to wonder with the argument about his size, et cetera, that didn't keep him from being engaged in two fights to the point where he would be suspended.

Despite going through DJS and while getting counseling with a counsellor that he liked and with whom he had bonded, once again in August we have him shooting over a crowd of people and a month and a half later we have him in possession of a loaded handgun at a playground, eleven in the clip and one in the chamber ready for action. These are very serious and

9

dangerous behaviors on two occasions and when you tag it into the prior behavior it makes it seem worse.

So, going back, as to the public safety, which is a very large concern here, we have a history of the two armed robberies. The risk to the public safety this Court views that as being very high. Tagging into the nature of the offenses, once again we have shooting over a crowd of people and we also have him going around with a loaded handgun at a playground.

Ultimately, the circuit court ruled that transferring Mr. Rohrbaugh's cases to the juvenile court would not be in the interest of Mr. Rohrbaugh or society. The court found that it was not likely that Mr. Rohrbaugh would benefit from available DJS programs better than he would from anything available in the adult system. The court also found that transferring Mr. Rohrbaugh's cases would not reduce the likelihood of recidivism or make him a more productive, law-abiding person. The court explained that, while it "was a very close case[,]" Mr. Rohrbaugh failed to carry his burden. The court then denied his transfer motion.

### *Not Guilty Agreed Statement of Facts*

Mr. Rohrbaugh thereafter waived his right to a jury trial and proceeded to a bench trial, where he pleaded not guilty pursuant to an agreed statement of facts. As part of that agreement, the State dismissed all but one of the charges. The remaining charge was possession of a regulated firearm by a person under the age of twenty-one. The State then read into the record the statement of facts, which established that, on September 28, 2021, Mr. Rohrbaugh was arrested and found in possession of a loaded firearm. The court subsequently found Mr. Rohrbaugh guilty of the sole charge and sentenced him to a term

of five years' imprisonment, suspended all but time served, and a four-year period of probation. This timely appeal followed.

**DISCUSSION**

**I.**

Mr. Rohrbaugh first argues that the circuit court erred in placing the burden of persuasion on him when ruling on his transfer motion. He asserts that, because CP § 4-202 does not expressly state which party bears the burden of persuasion, the statute is ambiguous. He further asserts that, while this Court has previously stated that the juvenile bears the burden of persuasion at a transfer hearing, those statements should be rejected as *dicta*. Mr. Rohrbaugh argues that various policy considerations dictate that the State should bear the burden, particularly because the State, by bringing charges against a juvenile in the adult system, is challenging the "status quo" of juvenile delinquents being treated by the courts as juveniles rather than as adults. He also argues that placing the burden on the State would be more convenient and equitable. Finally, Mr. Rohrbaugh maintains that CP § 4-202 creates a "liberty interest" for a juvenile that is entitled to constitutional protections. He asserts that placing the burden of persuasion on the juvenile infringes upon those protections.

The State posits that none of Mr. Rohrbaugh's arguments have merit and that, consequently, the circuit court did not err in placing the burden of persuasion on him. First, the State contends that this Court has long held that, when a juvenile seeks a transfer pursuant to CP § 4-202, the juvenile bears the burden of persuasion. The State asserts that that precedent is not *dicta* and is consistent with the plain language of the statute. Second,

11

the State contends that, even if the issue had not already been settled, this Court should nevertheless follow the general rule that the moving party bears the burden of proof. The State argues that, for each of Mr. Rohrbaugh's policy arguments in favor of placing the burden of proof on the State, there is an equally compelling argument as to why the juvenile should bear the burden. Lastly, the State asserts that Mr. Rohrbaugh's constitutional arguments should be rejected because there is no constitutional right to be treated as a juvenile. The State further asserts that, even if CP § 4-202 did create a constitutionally-protected liberty interest, placing the burden of proof on the juvenile would not hinder that interest.

### A.

Ordinarily, the juvenile court has exclusive original jurisdiction over a delinquent child, *i.e.*, a person under the age of 18 who is alleged to have committed an act that would be a crime if committed by an adult. CJP § 3-8A-03; *see also* CJP § 3-8A-01. When delinquency proceedings have been initiated in the juvenile court, the State may seek a waiver of the juvenile court's jurisdiction, and, if the waiver is granted, the State may charge the juvenile as an adult in the criminal court. CJP § 3-8A-06. In determining whether to waive its jurisdiction, the juvenile court must consider: (1) the juvenile's age; (2) the juvenile's mental and physical condition; (3) the juvenile's amenability to treatment; (4) the nature of the offense and the juvenile's alleged participation in the offense; and (5) the public safety. CJP § 3-8A-06(e). The juvenile court cannot waive its jurisdiction unless it determines from a preponderance of the evidence "that the child is an unfit subject for juvenile rehabilitative measures." CJP § 3-8A-06(d)(1). A transfer of

12

jurisdiction from the juvenile court to the criminal court is sometimes referred to as a "waiver." *See Gaines v. State*, 201 Md. App. 1, 8 (2011).

Where, however, a juvenile is at least 16 years old and is alleged to have committed certain enumerated crimes, the juvenile court is deprived of jurisdiction, and original jurisdiction over the juvenile lies in the adult court. CJP § 3-8A-03(d); *see also Gaines*, 201 Md. App. at 10. In that situation, delinquency proceedings involving the juvenile cannot be brought in the juvenile court "unless an order removing the proceeding to the court has been filed under § 4-202 of the Criminal Procedure Article[.]" CJP § 3-8A-03(d)(4). Thus, if appropriate criminal charges are brought against a juvenile in the circuit court pursuant to that court's original jurisdiction, a juvenile court may subsequently obtain jurisdiction over the juvenile only if the circuit court grants a motion pursuant to CP § 4-202. Such a transfer is sometimes referred to as a "reverse transfer" or "reverse waiver." *See Gaines*, 201 Md. App. at 10-11. As noted, a circuit court may transfer jurisdiction to the juvenile court if, among other factors, it "determines by a preponderance of the evidence that a transfer of its jurisdiction is in the interest of the child or society." CP § 4-202(b)(3). And, before granting or denying a transfer request, the circuit court must consider the five factors outlined in CP § 4-202.

As we explained in *In re Ricky B.*, 43 Md. App. 645 (1979), although the circuit court and the juvenile court must engage in nearly the same inquiry when deciding whether to waive their respective jurisdictions, the burden of persuasion is different. *Id.* at 648-49. "When a juvenile stands accused of one of those offenses expressly excluded from juvenile court jurisdiction, he or she carries the burden of establishing … that the adult or criminal

13

court should waive jurisdiction to the juvenile court." *Id.* at 649. "On the other hand, when it is the State that seeks a waiver of jurisdiction from the juvenile court to the adult or criminal court, the State shoulders the onus of showing by a preponderance of the evidence that a weighing of five factors tilts in favor of waiver and, patently, against the juvenile." *Id.*

Since our decision in *In re Ricky B.*, we have repeatedly emphasized that the juvenile bears the burden of persuasion at a reverse waiver hearing. *E.g., Gaines*, 201 Md. App. at 9-10 (noting that, at a waiver hearing, "[t]he burdens of production and persuasion fall on the State[,]" whereas, at a reverse waiver hearing, "the juvenile bears the burden of persuasion"); *Whaley v. State*, 186 Md. App. 429, 444 (2009) ("The burden is on the juvenile to demonstrate that under [the] five factors, transfer to the juvenile system is in the best interest of the juvenile or society."); *Crosby v. State*, 71 Md. App. 56, 63 (1987) ("In the juvenile court the burden is on the State to establish that the juvenile system does not offer a viable chance to the juvenile for rehabilitation, whereas at the circuit court level the burden is on the juvenile to demonstrate he or she is suitable for rehabilitation[.]").

Against that backdrop, we hold that the circuit court in the instant case did not err in placing the burden of persuasion on Mr. Rohrbaugh. The above caselaw makes clear that the burden is on the State when a waiver of the juvenile court's jurisdiction is sought, and the burden is on the juvenile when a reverse waiver is sought. That allocation of the parties' burdens is consistent with the plain language of the respective statutes. In a waiver proceeding, it must be shown "that the child is an unfit subject for juvenile rehabilitative measures." CJP § 3-8A-06(d)(1). In a reverse waiver proceeding, it must be shown "that

14

a transfer of [the criminal court's] jurisdiction is in the interest of the child or society." CP § 4-202(b)(3). Given that the State is the party seeking a waiver to the criminal court and the juvenile is the party seeking a reverse waiver to the juvenile court, it stands to reason that it is the moving party who must make those affirmative showings under the respective statutes. To allocate the burdens any other way would make little sense. For instance, were the State required to carry the burden in opposing a juvenile's request for a reverse waiver, it would have to show that a transfer of the criminal court's jurisdiction was *not* in the interest of the child or society. Such a requirement would be contrary to the statute's plain language, which, as noted, unambiguously states that the criminal court must determine "by a preponderance of the evidence that a transfer of its jurisdiction *is* in the interest of the child or society." *Id.* (emphasis added).

Mr. Rohrbaugh argues that the aforementioned cases are not controlling. Relying on *State v. Baby*, 404 Md. 220 (2008), Mr. Rohrbaugh insists that the statements we made in those cases concerning the burden of persuasion should be disregarded as "*obiter dictum*" because "the decisions in those cases did not rest upon the allocation of the burden issue."

We are not persuaded. First, Mr. Rohrbaugh's reliance on *State v. Baby* is misplaced. There, the Court refused to give precedential weight to a statement it had made in *Battle v. State*, 287 Md. 675 (1980), in which the Court suggested that there can be no rape if a woman consents prior to penetration and then withdraws that consent following penetration. *Baby*, 404 Md. at 246. The Court, in holding that its statement in *Battle* should be characterized as *obiter dictum* and thus be given no precedential weight, noted that the

15

statement "was not made on a point that was argued by counsel and deliberately addressed by this Court, but rather was a collateral statement." *Id.* The Court further noted that its "decision in *Battle* was not dependent upon this statement; the holding would indeed be unaffected were that language to be removed." *Id.* The Court explained that the statement at issue appeared "to be tacked on as an articulation of the converse of the Court's previous statement" and was "not subjected to any analysis as to its application[.]" *Id.*

By contrast, in each of the cases from this Court regarding the burden of persuasion at a reverse waiver hearing, the propriety of a court's decision regarding waiver or reverse waiver was directly at issue. *E.g.*, *Gaines*, 201 Md. App. at 8-23; *Whaley*, 186 Md. App. at 443-51; *Crosby*, 71 Md. App. at 59-68; *In re Ricky B.*, 43 Md. App. at 648-50. Thus, it cannot be said that the statements made in those cases concerning the burden of persuasion were collateral to our subsequent decisions, nor can it be said that those decisions were independent of how the parties' burdens were allocated. *See Bricker v. Warch*, 152 Md. App. 119, 137-38 (2003) ("[I]t is important to note, and it should always be noted in every case, on which party the burden of persuasion rested.").

Moreover, whether the appropriate standard of proof has been applied in a case is an issue of law. *Maryland Bd. of Physicians v. Elliott*, 170 Md. App. 369, 425 (2006). And, as the Court has made clear, "[w]hen a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum*, although the final judgment in the case may be rooted in another point also raised by the record." *Schmidt v. Prince George's Hosp.*, 366 Md. 535, 551 (2001). Thus, our deliberate expression of our opinion regarding

16

the legal question of which party bears the burden in a waiver or reverse waiver case cannot be considered *obiter dictum*.

Lastly, we note that our decisions allocating the burden of persuasion to the juvenile in a reverse waiver hearing have stood for over 40 years without any change in the statute. We interpret the Legislature's silence as tacit approval of our decisions. *See Wadsworth v. Sharma*, 479 Md. 606, 622 (2022) ("We presume that the General Assembly is aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation.") (quotation marks and citations omitted).

**B.**

Assuming without deciding that the burden of persuasion issue remains unsettled, we would nevertheless hold that the circuit court did not err in placing the burden on Mr. Rohrbaugh. Ordinarily, the moving party has the burden of production and persuasion. *Epps v. State*, 193 Md. App. 687, 702 (2010). Although that allocation may change depending on the circumstances of a particular case, "the general practice is to allocate the burden of proof to the party asserting the affirmative of an issue, or seeking to change the status quo." *Garrett v. State*, 124 Md. App. 23, 28 (1998).

Here, Mr. Rohrbaugh was the moving party, and it was he who was asserting the affirmative of the issue. That is, Mr. Rohrbaugh was the party asserting that a transfer of the circuit court's jurisdiction was "in the interest of the child or society." CP § 4-202(b)(3).

Mr. Rohrbaugh was also the party seeking to change the status quo. All of the charges in the instant case were properly brought in the circuit court, as the juvenile court was deprived of jurisdiction pursuant to CJP § 3-8A-03. Had Mr. Rohrbaugh done nothing, that is, had the status quo been maintained, then the charges would have remained in the circuit court. By filing his reverse waiver motion, Mr. Rohrbaugh was asking the circuit court to alter the status quo and waive its jurisdiction in favor of a transfer to the juvenile court. As such, Mr. Rohrbaugh was properly required to prove, by a preponderance of the evidence, that a reverse waiver was appropriate.

Mr. Rohrbaugh argues that the State, not he, was the party seeking to change the status quo because "the State desires change when it seeks to treat juveniles as adults." Mr. Rohrbaugh is mistaken. By charging Mr. Rohrbaugh in circuit court, the State was not desiring change; rather, the State was merely following the law as set forth by the Legislature. While delinquent juveniles are ordinarily treated in the juvenile system, 16-year-old juveniles who are alleged to have committed certain crimes are not. In fact, those juveniles must be prosecuted in a criminal court and cannot be treated in the juvenile system unless the criminal court waives its jurisdiction. In that situation, it is the juvenile who is seeking change when he files for a reverse waiver.

We are similarly unpersuaded by Mr. Rohrbaugh's various "policy" arguments.[2] While it may be, from the juvenile's perspective, more convenient and equitable to place

---

[2] For the sake of brevity, we have omitted some of the details of Mr. Rohrbaugh's policy argument. We did, however, consider the entirety of Mr. Rohrbaugh's argument and found it unpersuasive.

18

the burden on the State, it is just as convenient and equitable to place the burden on the juvenile. For instance, given that the State is likely opposing the juvenile's motion for a reverse waiver, it would be incongruous to require the State to bear the burden of gathering and producing information, such as potential juvenile placements, that would lend support to the motion. Moreover, because the circuit court's decision to waive its jurisdiction is based in large part on the needs and circumstances of the juvenile, it would be more convenient to place the burden of production on the juvenile rather than the State, as the juvenile is in a better position to provide the requisite information.

Finally, we note that Mr. Rohrbaugh, in setting forth his argument, relies heavily on language from *Davis v. State*, 474 Md. 439 (2021). That reliance is misplaced. There, the Court considered "what is meant by 'amenability' under CP § 4-202(d) and how that relates to the other four factors listed in that statute." *Id.* at 451. Although the Court engaged in a lengthy discussion of the circuit court's duties in evaluating the five factors pursuant to a reverse waiver motion, at no point did the Court state, or even suggest, that the State bore the burden of proving the applicability (or non-applicability) of any of those factors. *Id.* at 451-67.

## C.

Mr. Rohrbaugh argues that allocating the burden of persuasion to the juvenile implicates the juvenile's due process rights. He maintains, therefore, that we should apply the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), a case in which the Supreme Court held that, when an individual's due process rights are implicated, a court should consider three factors: 1) "the private interest that will be affected by the

19

official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 334-35. Mr. Rohrbaugh argues that those factors weigh in the juvenile's favor because a juvenile has a substantial interest in a juvenile adjudication; because allocating the burden on the juvenile carries the risk that he will be erroneously classified as an adult offender and may deprive the court of necessary information; and because the State has an interest in making sure that children who are amenable to treatment are adjudicated in the juvenile system.

We are not persuaded by any of these arguments. First, we do not agree that a juvenile's constitutional rights are implicated by allocating the burden of proof to the juvenile. As the State correctly notes, "there is no constitutional right to be treated as a juvenile." *Miles v. State*, 88 Md. App. 360, 390 (1991) (quotation marks and citation omitted). Moreover, because a reverse waiver hearing is a civil matter, the allocation of the burden of persuasion would not ordinarily implicate due process rights. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) ("[O]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment.") (quotation marks and citation omitted). Finally, we have previously rejected due process challenges to the transfer statute, noting that "Maryland's legislative scheme of waiver is not violative of any of [a juvenile's] due process rights"

20

and that a juvenile is "afforded the full panoply of constitutional safeguards in the ensuing trial." *Miles*, 88 Md. App. at 390-92 (quoting *In re Samuel M.*, 293 Md. 83, 96 (1982)).

Assuming, *arguendo*, that Mr. Rohrbaugh's due process rights were implicated and that the *Mathews*' balancing test applied, allocating the burden of persuasion to him comports with that test. Although it is beyond question that a juvenile has an interest in being treated in the juvenile system, the Legislature has already determined that juveniles such as Mr. Rohrbaugh, *i.e.*, juveniles who are of a certain age and are alleged to have committed certain crimes, are beyond the jurisdiction of the juvenile court system and must be prosecuted in the adult system. In those situations, the State's Attorney is not "choosing" to pursue a case in the adult court; rather, the choice has been made by the Legislature. If the juvenile then wishes to be "treated" in the juvenile system, he or she must file a reverse waiver motion pursuant to CP § 4-202. It should therefore be up to the juvenile to show that the juvenile system is the more appropriate forum, given the Legislature's clear mandate that the juvenile be prosecuted in the adult system.

Even with the burden of proof being allocated to the juvenile following the filing of a reverse waiver motion, the subsequent proceedings are replete with due process protections. When a reverse waiver motion is filed, a court cannot deny the motion until it has evaluated, in considerable detail, the five factors outlined in the statute. *See Davis, supra*, 474 Md. at 462-67. No one factor can be given undue weight, and all of the factors must be considered with an eye toward the juvenile's amenability to treatment in the juvenile system. *Id.* During the course of those proceedings, the juvenile's police and court records remain confidential. CP § 4-202(i). Finally, if the court denies the motion

21

and the juvenile is subsequently prosecuted in the adult system, he or she is "afforded the full panoply of constitutional safeguards in the ensuing trial." *Miles*, 88 Md. App. at 392.

In sum, we hold that the circuit court did not err in placing the burden of proof on Mr. Rohrbaugh. The court's decision was consistent with the caselaw and did not infringe upon Mr. Rohrbaugh's constitutional rights.

**II.**

Mr. Rohrbaugh next claims that the circuit court erred in denying his reverse waiver motion. He argues that the court abused its discretion in three ways: by putting too much emphasis on the fact that Mr. Rohrbaugh would only be eligible for juvenile services until age 21; by assuming that he was guilty of the underlying charges; and by finding that there were programs in the adult system to treat youthful offenders, even though no such evidence was presented at the hearing. The State contends that the court properly and thoroughly considered all five factors and did not abuse its discretion in denying the motion.

As previously noted, CP § 4-202 states that a criminal court may transfer a case involving a child to the juvenile court if, among other things, "the court determines by a preponderance of the evidence that a transfer of its jurisdiction is in the interest of the child or society." CP § 4-202(b)(3). In making that determination, the court is required to consider: "(1) the age of the child; (2) the mental and physical condition of the child; (3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children; (4) the nature of the alleged crime; and (5) the public safety." CP §

22

4-202(d). We review the court's decision for abuse of discretion. *Whaley*, 186 Md. App. at 444.

In *Davis v. State*, Judge Wilner explained that the five factors "are not in competition with one another" and that, while they all must be considered, "they are necessarily interrelated and, analytically, they all converge on amenability to treatment." *Davis*, 474 Md. at 464. The Court reasoned that, while considerations such as public safety are important, the overarching question is whether there is "a program [in the juvenile system] that can provide immediate safety to the public and make recidivism less likely[.]" *Id.* at 465. If so, the Court concluded, "absent some other circumstance, the child should be transferred to … the juvenile system." *Id.* If, on the other hand, there is no program in the juvenile system available to the child that is "competent to address the issues defined" and "from which the child likely can benefit in a way that will produce better results than anything in the adult system and significantly lessen his danger to the public, a reverse waiver request should be denied[.]" *Id.* at 465-66.

Here, the circuit court found that, while Mr. Rohrbaugh was "young enough to be placed into the juvenile system[,]" he would only be eligible for juvenile services until age 21. The court expressed concern about that limited time frame given that an "awful lot of therapy … has been recommended." The court noted that it had "jurisdiction in the adult system for longer" and that, during that time, Mr. Rohrbaugh could "do all of the programs and counseling, et cetera."

Considering the mental and physical condition factor, the circuit court found nothing physically wrong with Mr. Rohrbaugh, despite his somewhat small stature. The

23

court noted that there were "a few things" on "the mental side," including depression, anxiety, and a trauma-related disorder stemming from "the issues with his father and the man that he thought was his father," the incident in which he was a victim of a home invasion, and the loss of several family members and close friends. The court noted that, while "trauma has a significant impact on juveniles as the brain is still developing[,]" the evidence established that a child's brain "is still developing up to the age of twenty-four[.]" The court explained that it was unsure "if that helps him or hurts him because that places him three years beyond juvenile jurisdiction."

Reviewing the key factor, Mr. Rohrbaugh's amenability to treatment in an institution, facility, or program available to delinquent children, the circuit court noted that Mr. Rohrbaugh had "two prior suspended commitments to the DJS" for which he received services, which included a victim awareness program, 100 hours of community service, and several months of therapy. The court noted that, while Mr. Rohrbaugh was receiving that therapy, he was arrested on the current charges, which stemmed from two separate incidents involving a firearm. The court posited: "While he did two of the programs, how amenable to treatment is he really when he continues to re-offend with a gun not once, but twice?" The court found that, despite "a two year involvement between [Mr. Rohrbaugh] and DJS[,]" there had been "no improvement." Instead, the court found, "the same dangerous behavior or worse" had continued "with the actual shooting of a gun over a crowd of people." The court found that Mr. Rohrbaugh had "a long term journey" that was "much longer than the juvenile system has even theoretically to the age of twenty-one." The court noted that, while there was evidence that DJS could place Mr. Rohrbaugh at the

24

current time, the evidence also showed that placement would become harder as Mr. Rohrbaugh aged. The court noted that there were "programs in the Division of Corrections for youthful offenders" and that Mr. Rohrbaugh "would have the time while [he] is in a secure facility, … and then we would have five full years available for probation upon release where service and supervision can continue." The court reasoned that "the adult system would have the resources to benefit [Mr. Rohrbaugh] and also protect society."

Addressing the nature of the alleged crimes, the circuit court highlighted "the August 16th, 2021 incident where [Mr. Rohrbaugh] allegedly shot a bullet over a crowd of people." The court found that the nature of the crime was "obviously a concern[.]"

Finally, as to the public safety factor, the circuit court noted that the "Transfer/Waiver Psychological Assessment rate[d] [Mr. Rohrbaugh] a moderate risk for future violence without the services that they recommend." The court found that assessment to be "concerning enough" but found that Mr. Rohrbaugh's "record and behavior speaks louder." The court noted that Mr. Rohrbaugh had "been suspended from school on at least two occasions for fighting" and was involved in an armed robbery in 2019 and another armed robbery in 2020. The court reiterated that, despite Mr. Rohrbaugh receiving services through DJS following the armed robberies, "once again in August we have [Mr. Rohrbaugh] shooting over a crowd of people and a month and a half later we have him in possession of a loaded handgun[.]" Based on those findings, the court determined that it was not in the interest of Mr. Rohrbaugh or society to transfer his cases to the juvenile court.

We hold that the circuit court did not err in denying Mr. Rohrbaugh's reverse waiver motion. Not only did the court consider all five statutory factors in great detail, but it did so with a clear focus on Mr. Rohrbaugh's amenability to treatment in the juvenile system. The court found that, while there were some circumstances that supported the reverse transfer, there were other, more critical circumstances to indicate that a reverse transfer was unlikely to provide immediate safety to the public and reduce the chance of recidivism. Those latter circumstances included: the limited time Mr. Rohrbaugh would be subject to the juvenile court's jurisdiction; the waning availability of services in the juvenile system for juveniles who are nearing age 21; the nature and extent of Mr. Rohrbaugh's mental health needs; the fact that Mr. Rohrbaugh had been receiving treatment in the juvenile system for two years following two separate gun-related offenses; the fact that Mr. Rohrbaugh was arrested on the current charges while he was receiving those services; and the fact that the current charges involved two separate gun-related incidents, one of which included the discharge of the firearm. The court found that, although there were programs available to Mr. Rohrbaugh in the juvenile system, those programs were likely insufficient given that he had already been exposed to some of those programs and had subsequently been arrested twice for gun-related offenses. The court reasoned that Mr. Rohrbaugh would benefit more from the services available via the adult system, particularly because, unlike in the juvenile system, there were no pressing time constraints on the court's ability to address Mr. Rohrbaugh's considerable issues.

In short, the court determined that there were no programs in the juvenile system that were "competent to address the issues defined" and "from which the child likely can

benefit in a way that will produce better results than anything in the adult system and significantly lessen his danger to the public[.]" *Davis*, 474 Md. at 465-66. Accordingly, we cannot say that the court abused its discretion in denying Mr. Rohrbaugh's reverse transfer motion.

We find no merit in Mr. Rohrbaugh's specific claims of error. First, the circuit court did not place too much emphasis on the fact that Mr. Rohrbaugh would only be eligible for juvenile services until age 21. According to Mr. Rohrbaugh, the court "should have considered the best available intervention to increase the probability of [his] future success" and to "make him 'a more productive and law-abiding person.'" (Quoting *Davis*, 474 Md. at 464.) That is precisely what the court did. The court determined that the best available intervention was to keep Mr. Rohrbaugh in the adult system. Although the court based that determination in part on Mr. Rohrbaugh's age, the court also considered the other four factors in reaching that decision. There is simply no support in the record that the court placed "too much emphasis" on the fact that Mr. Rohrbaugh would only be eligible for juvenile services until age 21.

As to Mr. Rohrbaugh's claim that the circuit court assumed him guilty of the charged crimes, we do not perceive any error. To be sure, the court did imply some modicum of guilt when it stated that Mr. Rohrbaugh had "re-offended." Nevertheless, we cannot say that the court was assuming Mr. Rohrbaugh guilty, nor can we say that the court erred in making some inferences regarding Mr. Rohrbaugh's alleged participation in the charged crimes. As we have explained, any consideration of the nature of the alleged crimes necessarily involves some assumption as to the juvenile's participation:

27

> [E]ven if the circuit court had weighed the level of appellant's alleged participation [in the alleged crimes], it would not have erred in doing so. It is difficult, if not impossible, to consider "the nature of the alleged crime," which the court must do, without considering the actions taken by the alleged perpetrators to commit that crime. Thus, we do not interpret that factor in the reverse waiver statute as being completely divorced from consideration of the actions taken by the alleged perpetrators.

*Gaines*, 201 Md. App. at 14; *cf. Whaley*, 186 Md. App. at 439 (holding that the court erred in assuming that the charges against the juvenile were true and in stating that it had to accept those facts in making its decision).

Finally, we are not convinced that the circuit court erred in finding that there were programs in the adult system to treat youthful offenders, even though there was no evidence in the record regarding Mr. Rohrbaugh's eligibility for such programs. As the body responsible for sentencing defendants in the adult system, the court certainly could take judicial notice of programs within that system and about which the court was aware. Moreover, the court, in making those statements, was not suggesting that the programs available through the juvenile system would also be available in the adult system. Rather, the court, in determining that the programs in the juvenile system were insufficient under the circumstances, was merely observing that, in the adult system, there are programs available for youthful offenders such as Mr. Rohrbaugh.

In sum, we hold that the circuit court did not abuse its discretion in denying Mr. Rohrbaugh's reverse waiver motion. The court conducted a thorough analysis of each of

28

the statutory factors and issued a well-reasoned decision based on those factors and the

circumstances of the case.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**